**LEHMAN CAPITAL, a division Lehman Brothers Holdings, Inc., a Delaware Corporation, Assignee of Wendover Financial Services Corporation, Assignee International Mortgage Corporation, Plaintiff Below, Appellant,**

v.

**Sudler LOFLAND, Personal Representative of the ESTATE Of Hester S. MONROE, Defendant Below, Appellee.**

**No. 511, 2005.**

Supreme Court of Delaware.

Submitted: July 26, 2006.
Decided: Aug. 25, 2006.

---

19. *Williams v. Geier*, 671 A.2d 1368, 1381 n. 28 (Del.1996).

20. 891 A.2d at 190.

Janet Z. Charlton, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for appellant.

Martin J. Cosgrove, Jr., Moore & Rutt, P.A., Georgetown, Delaware, for appellee.

Before, STEELE, Chief Justice, BERGER, and JACOBS, Justices.

STEELE, Chief Justice.

The plaintiff-appellant, Lehman Capital appeals from the Superior Court's September 27, 2005 Order dismissing with prejudice a complaint Lehman filed as a sanction for Lehman's discovery violations. Lehman filed its complaint against the administrator of a decedent's estate seeking a sum of over $100,000 due under a reverse mortgage that the decedent had executed. Because of various perceived discovery violations, the trial judge entered an order dismissing Lehman's complaint with prejudice. Lehman argues that the trial judge abused his discretion by dismissing the complaint because the record does not support a finding that Lehman willfully or consciously disregarded any order relating to discovery. We agree that the trial judge abused his discretion. Absent a willful and conscious disregard by Lehman of its discovery obligations, the remedy of dismissal with prejudice was too extreme. Accordingly, we vacate the trial judge's order in part, reverse, and remand with instructions to enter a more appropri-

ate sanction commensurate with the facts of record.

## FACTS

Hester S. Monroe owned property located at 617 Seabury Avenue in Milford, Delaware. On March 20, 1997, Monroe executed a reverse mortgage[1] to International Mortgage Corporation for $120,852. Thereafter, International Mortgage assigned the mortgage to Wendover Financial Services, which in turn, assigned the mortgage to the appellant, Lehman Capital. Wendover, however, continued to service the mortgage.

Under the mortgage, Wendover remitted to Monroe scheduled monthly payments of $841.39 from April 1, 1997 until her death on March 18, 2003. Upon Monroe's death, the lender's obligations to remit monthly payments ended and the sum then secured by the mortgage became due and payable.[2] For reasons not reflected in the record, no one informed Wendover or Lehman of Monroe's death until August 2003. Consequently, Monroe's estate continued to receive the $841.39 monthly payments from April 2003 until August 2003.

On August 28, 2003, the Sussex County Register of Wills granted Sudler Lofland, the defendant below and appellee here,

Letters of Administration for Monroe's estate. Lofland was the funeral director who handled Monroe's burial and services after her death, and was also a creditor of her estate. At some point after he was granted the Letters of Administration, Lofland became aware of the reverse mortgage encumbering Monroe's property. Lofland retained counsel to represent the estate. On October 23, 2003, Lofland's counsel sent a letter to Lehman Capital, informing Lehman that he was representing Lofland and that the estate "may have to sell the realty to pay estate debt." Counsel also requested "the mortgage balance and a history of payments by ... Monroe and a history of advances to her under the mortgage since March 20, 1997...." Lehman did not respond to Lofland's counsel's letter. Instead, on November 26, 2003, Lehman filed a foreclosure action against Lofland in the Sussex County Superior Court seeking to recover the principal amount of $119,989.45 "together with interest after September 1, 2003."

Lehman's trial counsel[3] improperly served Lofland with the complaint on December 9, 2003. Because he had been improperly served, Lofland did not answer the complaint within the twenty days re-

---

1. A reverse mortgage differs from a conventional mortgage. In a conventional mortgage the borrower-mortgagor borrows a sum of money from the lender-mortgagee and repays that sum over time, with interest. In a reverse mortgage, the borrower does not receive an up-front loan. Rather the lender disburses money over a long period to provide regular income to the (usually elderly) borrower. In effect, the reverse mortgage allows a borrower who has accumulated equity in his property to convert that equity into monthly payments from the lender. The loan in a reverse mortgage is usually repaid in a lump sum when the borrower dies or when the property is sold. See BLACK'S LAW DICTIONARY 1033 (8th ed.2004).

2. The record appears to reflect that, despite the fact that Wendover assigned the mortgage to Lehman, Wendover continued to remit the payments to Monroe and Monroe's estate through August 2003. See "Wendover Financial Services Corporation, Reverse Mortgage Loan History Breakdown." A–195.

3. Lehman had a different attorney during the discovery and trial process than it now has on appeal. References to Lehman's "trial attorney", "trial counsel", "attorney", or "counsel" are to the attorney that managed the discovery.

quired by the Superior Court Rules.[4] Lofland's counsel, apparently having no knowledge of Lehman's complaint, did, however, send a letter to Lehman's counsel on February 13, 2004. In that letter, Lofland's counsel calculated that the outstanding amount of the mortgage due was $110,270.16, questioned about charges for "line of credit" and "repair set asides," informed Lehman's counsel that the estate was negotiating with potential purchasers of Monroe's property, and, importantly, informed Lehman's counsel that Lofland was willing to pay $116,000 in full satisfaction of the mortgage balance. The record does not reflect whether Lehman's trial counsel responded to that letter.

Having received no answer to his improperly served complaint, Lehman's trial counsel filed a "direction for entry of judgment" with a supporting affidavit on March 2, 2004. The total amount of the default judgment entered was $134,409.19.[5]

After obtaining the default judgment on March 2, 2004, (presumably) Lehman's trial counsel[6] sent a letter on his firm's letterhead to Lofland at Monroe's address on March 15, 2004. The letter advised that the "amount to payoff the ... account" was $131,167.67[7] (inexplicably about $3,200 less than the amount of the default judgment), informed Lofland that that payoff amount was valid through April 13, 2004, and directed Lofland to make his check payable to Wendover and to mail it to Lehman's trial counsel's office. The record does not disclose whether Lofland responded to this letter.

On April 19, 2004, after apparently becoming aware that he had improperly served Lofland with the complaint, Lehman's trial counsel moved to vacate the default judgment entered on March 2, 2004 noting that "[t]he Personal Representative in this matter was not properly served." The next day, the trial judge entered an order vacating the default judgment.

Lehman's trial counsel properly served Lofland with a re-filed complaint on May 3, 2004. Lofland timely answered the complaint ten days later, and contested what appears to be about $15,000 of the amount allegedly due under the mortgage.[8] On June 29, 2004, Lofland filed and served his first set of interrogatories, a request for production of documents, and a request for admissions. Thereafter, on July 20, 2004, the parties attended a scheduling conference with a Superior Court Commissioner. On July 28, 2004, The Commissioner entered an order setting forth the following relevant dates:

(1) All discovery shall be completed by November 30, 2004.

4. Del.Super. Ct. Civ. R. 12(a).

5. The $134.409.19 represented a principal of $86,357.95, interest through March 15, 2004 of $34,224.61, attorney fees of $6,029.13, a "Corporate Advance" of $3,445.00, an "Escrow Advance" of $3,100.00, "Property Preservations" of $375.00, "Property Inspections" of $87.50, and court costs of $790.00.

6. We say "presumably" because the letter, which was attached as an exhibit to Lofland's answer, appears to be a boilerplate collection letter and does not have an attorney's signature. (A–41).

7. The payoff amount included the following components: Principal Balance: $122,896.33; Interest $655.09; Service Fee: $60.00; Corporate Advance: $3346.25; Forced Place Insurance: $1,550.00; Foreclosure Fees and Costs: $2,660.00, for a total of $131,167.67. Interestingly, the amounts in this letter do not match the amounts set forth in the "direction for entry of default judgment" filed on March 2, 2004.

8. Lofland contested the "Line of Credit", "Repair Set Aside", and the "Corporate Advance."

(2) Dispositive motions shall be filed by November 10, 2004, with responses filed by November 30, 2004.

(3) The pretrial stipulation is due no later than noon on December 27, 2004.

(4) A pretrial conference is scheduled for January 3, 2005.

(5) A one day non-jury trial is scheduled to commence on January 31, 2005 at the Superior Court in Georgetown, Delaware.

On August 5, 2004, Lofland filed an offer of judgment for $116,000 echoing the offer made in his counsel's February 13, 2004 letter to Lehman. Lehman did not accept that offer of judgment. The record does not reflect whether counsel for the parties conferred between August 5, 2004 and August 31, 2004 about Lofland's outstanding discovery requests, but on August 31, 2004, Lofland's attorney sent a letter to Lehman's attorney that supports the inference that they had not conferred:

On June 28, I served upon you Requests for Admissions, Interrogatories and Requests for Production. To date, I have not received an answer to any of this discovery. Under the Rules, the Requests for admissions have now been deemed admitted. With those admissions, it is our position that any attempts to collect on repair set asides or lines of credit have been waived. The only remaining question is the balance due on the mortgage.

\* \* \*

It is my intent to file a Motion for Partial Summary Judgment on the basis of the admissions to limit the amount

due solely to the mortgage.... I also intend to file a Motion to Compel the answers to the other discovery. I would hope that would not be necessary. I will withhold filing until September 9, 2004 in anticipation that I will receive the information.[9]

Lofland's counsel apparently decided to give Lehman's trial counsel even more time to respond to the outstanding discovery requests, because he did not file a Motion to Compel on September 9th. About two weeks later, on September 20, 2004, Dana Federspiel, a Litigation Specialist at Wendover, sent documents responsive to Lofland's discovery requests, as an attachment to an email, to a secretary at Lehman's trial counsel's office. In its entirety the email read: "I am still waiting on a response from FNMA for fee approval .... in the meantime I am sending you the docs required to respond. Please do not take any action prior to fee approval as I am not sure how FNMA will respond to $195/hr fee request. Dana." [10] Lehman's trial counsel's secretary never forwarded this email or the documents to Lehman's trial counsel, nor was trial counsel aware that his secretary had received them.

As of October 23, 2004, Lehman's trial counsel had neither responded to any of Lofland's discovery requests nor to Lofland's counsel's letter of August 31, 2004. Accordingly, on that date, Lofland's counsel filed a Motion for Partial Summary Judgment requesting that the Court deem certain of Lofland's Requests for Admissions admitted and that the amount due Lehman be limited to principal and inter-

---

9. At oral argument, Lofland's counsel informed us that he had "in passing" or "in connection with another matter" mentioned his outstanding discovery to Lehman's trial counsel. It is unclear when these exchanges occurred, however, and Lofland's counsel explicitly stated that these informal exchanges were not reflected in the record.

10. The "...." was in the original email and is not our elision.

est. On October 26, 2004, Lofland's counsel filed a Motion to Compel. On November 3, 2004, Lehman's trial counsel made an effort to respond to the interrogatories and requests for document production. He indicated that Dana Federspiel was the person at Wendover with knowledge of the allegations in the complaint, but did not mention Federspiel at any other point in his answers to the interrogatories.[11] He also attached a copy of the mortgage, the note, and the "Multistate Home Mortgage Loan Agreement" that applied. Lehman's trial counsel did not, however, include the responsive payment history that Federspiel had provided in her September 20, 2004 email, apparently because he was not aware that that information had been forwarded to his office by email attachment.

Two days later, on November 5, 2004, the trial judge held a contested hearing on Lofland's outstanding motions at which both Lehman's and Lofland's counsel appeared. At the beginning of the hearing, the trial judge asked Lehman's trial counsel if he had filed discovery responses after Lofland's counsel filed his motion to compel. Lehman's trial counsel represented that he had and apologized to the court, noting that "it's been like pulling teeth to find someone in [Lehman's] organization that provided me with information, and I still really don't have a contact. I am still working on that. I have one person who is [sic] finally sent me an e-mail. I have not had a chance to contact her directly by phone."[12] Regarding the motion to compel the trial judge stated "I'm going to give you two more weeks. I understand your difficulties, but ultimately, your client has to make this a priority and deal with it or not deal with it. They are the plaintiffs. They don't want to pay attention to it so be it."

Lehman's trial counsel conceded that the requested admissions in Lofland's Request for Admissions were deemed admitted,[13] but contested the motion for summary judgment. The trial judge ultimately ordered that the requested admissions were deemed admitted, declined to address the motion for summary judgment, and ordered that Lehman provide responsive discovery—specifically a payoff statement detailing how the sums were disbursed under the reverse mortgage as they related to the "corporate

11. In response to Interrogatory No. 13, which provided "State the name, address, and telephone number of each person that Plaintiffs will call to testify as a witness....", Lehman's trial counsel answered only that he intended to call the "custodian of the records," but that "no witness has yet been identified for trial. The name will be provided when determined."

12. Given the context, we assume that Lehman's trial counsel was not referring to the September 20, 2004 email. At another point, Lehman's trial counsel represented: "I will state for the record I am still in the process of effecting a settlement. I don't think either side needs to go forward for $3,000, but we have to find someone who will talk to me."

13. The admissions deemed admitted follow: (1) The mortgage agreement signed on March 20, 1997, by the deceased ..., and which is the subject of this foreclosure, does not include any provision by which Plaintiffs can charge for a "repair set-aside"; (2) The mortgage agreement signed on March 20, 1997, by the deceased ..., and which is the subject of this foreclosure, does not include any provision by which Plaintiffs can charge for a "line of credit"; (3) The Defendant, through his attorney, has requested that the Plaintiffs, through their attorney, provide a payoff to the mortgage that does not include charges for a "repair set-aside" or for a "line of credit"; (4) The Defendant, through his attorney, has requested from the Plaintiffs, through their attorney, a proper accounting of the mortgage; (5) The mortgage agreement signed on March 20, 1997, by the deceased ..., and which is the subject of this foreclosure, does not include any provision by which Plaintiffs can charge for service charges.

advance"—by November 19, 2004. On the day of the hearing, the trial judge entered orders to effectuate his rulings.

On January 3, 2005, the trial judge held the pretrial conference per the Scheduling Order of July 28, 2004 and confirmed the trial date for January 31, 2005. For reasons not disclosed in the record, the parties failed to file their pretrial stipulation by December 27, 2004, as the Scheduling Order required. Instead, they filed the pretrial stipulation on January 11, 2005. The pretrial stipulation did not specifically indicate that there were any outstanding discovery issues. It did, however, in the "Brief Statement of the Defense" provide:

> Answer: Defendant admits that ... Monroe signed the mortgage and the estate owes the principal and *some* interest. However, the exact amount of principal is unknown because the Plaintiff has refused to provide a payoff and formal accounting of the mortgage despite numerous requests by the Defendant. Therefore, the Defense contends that the amount due under the mortgage should be the amount of principal and interest due on the date of the first request by the Defendant dated October 23, 2003. (emphasis in original).

The pretrial stipulation also provided that only one legal issue remained for trial, specifically, "whether interest continues to accrue on the principal due under the mortgage after the Defendant made formal demand for payoff and accounting and the Plaintiff refused to provide the requested information."

On January 27, 2005, the trial judge *sua sponte* continued the trial until May 4, 2005 and scheduled the second pretrial conference for April 5, 2005. The trial judge did not change any of the other dates from the original July 28, 2004 Scheduling Order, including the original November 30, 2004 discovery cut-off date.

The parties filed a second pretrial stipulation virtually identical in content to the first on March 31, 2005. The second pretrial stipulation included the same paragraph quoted above under the heading "Brief Statement of the Defense," the same issue of law to be litigated, and, again, did not specifically indicate that there were any outstanding discovery issues. As scheduled, on April 5, 2005, the trial judge held the second pretrial conference. The record reflects that the trial judge noted that there were "no problems; [and] trial [was] to proceed as scheduled." The trial judge also apparently intended that his clerk "check on [the] Monday prior [to trial] for scheduling [Lehman's] witness (travel arrangements)."

On May 2, 2005, two days before the rescheduled trial, Lofland filed a Motion in Limine, seeking to exclude evidence based on Lehman's (1) admissions, (2) failure to identify the witnesses it intended to call at trial, and (3) failure to provide the requested history and accounting of payments. Lehman responded to the motion on May 3, 2005, arguing (1) that it should be allowed to introduce evidence to support its claims contrary to the request for admissions that the trial judge had deemed admitted because the admissions were matters of public record, (2) that it had identified its witness, Dana Federspiel, in its November 3, 2004 answers to the defendant's interrogatories, (3) that "travel arrangements have been made for [that] witness," and (4) that "[Lofland] has been informed through counsel that there is no 'payment history' as such on a Reverse Mortgage." The trial judge did not address these motions because, on May 3, 2005, he again continued the trial, this time until June 23, 2005, apparently because Federspiel had not made timely travel arrangements, contrary to Leh-

man's counsel's representation in his response to Lofland's Motion in Limine.

About three weeks later, on May 23, 2005, well after the November 30, 2004 discovery cut-off date set forth in the July 28, 2004 Scheduling Order, Lofland's counsel noticed Federspiel's deposition for June 9, 2005. Lehman's trial counsel did not became aware of the notice of deposition until June 8, 2005, because he had been injured on May 31, 2005 and was out of the office "for a little over a week" thereafter. After Lehman's trial counsel learned of the notice of deposition, on June 8, he called Lehman and learned that while Federspeil was no longer an employee,[14] Tony Hummell would be available to testify in Federspiel's place. On June 9, 2005, Lehman's counsel appeared for the scheduled deposition without a witness, but advised Lofland's counsel that he intended to call Hummell to testify in Federspiel's place. Lehman's counsel did not, at that point, produce or offer to produce the payout history. He did, however, offer to make Hummell available for a deposition the following week. Lofland's counsel did not accept this offer, but instead renewed his Motion in Limine that same day.

On June 16, 2005, Lofland received the information demanded in discovery and ordered by the trial judge, including updated versions of the documents Federspiel sent to Lehman's counsel via email on September 20, 2004. Lofland filed a Motion for Sanctions on June 20, 2005.[15] On the following day, Lofland apparently received the attachment to Federspiel's email as well as the email itself.[16] Before beginning the trial on June 23, 2005, the trial judge heard Lofland's Motion in Limine and Motion for Sanctions. The arguments focused on Federspiel's September 20, 2004 email and whether that email directly instructed Lehman's trial counsel not to produce the attached responsive discovery

14. It is unclear from the record when Federspiel stopped working for Wendover, and particularly whether this occurred before or after May 4, 2005, when she failed to appear for the rescheduled trial. Lofland represents that on June 8, 2005 Lehman's attorney contacted Lofland's attorney and "advised ... that ... Federspiel was still employed by [Lehman] but would not be as of the date of the trial" but his citation to the appendix does not support that statement.

15. Lofland requested that the court: "(a) Prohibit [Lehman] from offering evidence in support of any alleged complaint; (b) Prohibit [Lehman] from offering any witness in support of [its] claims ...; (c) Strike all pleadings from [Lehman's] Complaint for which [it] failed to produce evidence; (d) Dismiss [Lehman's] Complaint, (e) Enter Default Judgment in favor of [Lofland]; (f) Award fees and costs in favor of [Lofland] and against [Lehman] for the Motions to Compel and for this Motion now before the Court; (g) ... obligate ... [Lehman] to pay all expenses incurred by [Lofland] in the scheduling of the deposition, including but not limited to, payment of attorney's fees, reporter costs and copy costs."

16. At oral argument before this Court, Lofland's counsel represented that he did not see Federspiel's email until the morning of June 23, 2005. The record seems to suggest otherwise. At arguments before the June 23rd trial, Lofland's counsel stated: "This e-mail that [Lehman's trial counsel] included in my package and shared with the Court from September the 20th shows that the bank had this information and this knowledge of it, the knowledge we had requested it, but they asked [Lehman's trial counsel] to sit on it." The reference to the "package" may be to the package that was hand-delivered to Lofland's trial counsel on June 21, 2005, but might also refer to a "first package" that Lehman's counsel faxed to Lofland's counsel on June 16, 2005. Although the record is unclear, the June 16, 2005 package probably included only the updated versions of the payout documents that were attached to Federspiel's September 20, 2004 email, and the June 21 st package probably included the email itself and the original attachments.

to Lofland. The following relevant exchanges occurred:

The Court: [Lehman's trial counsel], did you ever get any response from your client as to when you could release these documents?

[Lehman's Trial Counsel]: No

The Court: Never?

[Lehman's Trial Counsel]: No.

The Court: They weren't asking you to do anything, they were going to some other party for approval and if they got approval or disapproval or something else, then they were going to tell you you could comply with the Court order? ... I don't see where you did anything wrong, [Lehman's trial counsel]. They told you not to do anything. Maybe they should have complied to their costs. Maybe you should have come back to the case, but I issued an order. Your client was aware of that order. Your client made a conscious decision not to abide by the Court order.

\* \* \*

The Court: The difficulty in this case was effecting that calculation of the numbers. The defendant filed requests for that. The plaintiff did not comply. I ordered that the plaintiff comply and plaintiff *may have imade a conscious decision not to comply* and then the thing sat for nine month [sic] and here we are. This case had been in this Court for the better part of two years and the plaintiff's compliance with the rules of the Court, the discovery rules, and the Court's orders have been unacceptable. This goes back several weeks ago on the eve of trial. The plaintiff's witness decided she was not even coming to trial and pushed it back a couple weeks. I probably should have dismissed the case then, but how my order was not complied with is just unacceptable. I am not going to tolerate it. I'm going to dismiss the plaintiff's complaint with prejudice. I will access [sic] costs against the plaintiff. I will access [sic] attorney's fees incurred by the defendant against the plaintiff.

\* \* \*

The plaintiff, you certainly have the right to take an appeal of any decision to the Supreme Court. You can explain to the Supreme Court why you willingly and consciously disregarded the Court's very clear order to produce what was a critical piece of information in this case. That is a harsh result. I'm making this decision knowingly, but I'm simply not going to tolerate woeful [sic] refusal to comply with an order of the Court. Thank you.

On September 27, 2005, the trial judge entered a written order giving effect to his Bench ruling. The order dismissed Lehman's complaint with prejudice, ordered Lehman's mortgage satisfied of record, assessed costs against Lehman, and granted Lofland's demand for attorney's fees in the amount of $13,243.80. The trial judge articulated three reasons for granting this relief:

[Lehman] (1) failed to follow the rules of Court regarding discovery, (2) willfully refused to comply with the Court's order directing [Lehman] to provide [Lofland] certain financial information which was at the center of the dispute between the parties, and (3) failed to abide by the pre-trial scheduling order regarding the trial date resulting in the trial having to be rescheduled the day before the trial because the plaintiff's witness did not make arrangements to travel to Delaware for the trial.

Lehman appeals from that September 27, 2005 Order.

## DISCUSSION

 Lehman argues on appeal that the trial judge abused his discretion by imposing the sanction of dismissal of the complaint with prejudice for the discovery violations, absent a showing in the record that Lehman had acted in conscious or willful disregard of a court order. Because a trial judge has broad discretion to impose discovery sanctions we "will not disturb a trial [judge]'s decision regarding sanctions imposed for discovery violations absent an abuse of discretion."[17] Although we "may not substitute [our] own notions of what is right for those of the trial judge ...,"[18] the trial judge's "decision to impose sanctions must be just and reasonable."[19]

 Under Superior Court Civil Rule 37(b)(2)(C), the trial judge has the authority to dismiss an action "when the complaining party fails to comply with court-ordered discovery."[20] The trial judge also has authority to enter a default judgment under that same rule.[21] Generally, the standards for testing the propriety of either a dismissal or a default judgment are the same.[22] We have held that entering judgment against a party as a sanction for discovery violations is an extreme remedy and generally requires some element of *willfulness or conscious disregard* of a court order before the trial judge can impose such a severe sanction.[23] Therefore, "where other less punitive sanctions [are] available ... [a] default judgment [or a dismissal with prejudice] is the *ultimate sanction* for discovery violations and *should be used sparingly.*"[24] Furthermore, although as a general rule a party is burdened with its attorney's errors, this rule is "inappropriate in th[e] instance where there is nothing to show willfulness or conscious disregard of the [orders] by plaintiff ... except the conduct of the lawyers."[25] Accordingly, "the extreme remedy of dismissal with prejudice is too punitive .... [when] counsel, not plaintiff, bears much if not all responsibility for failure to comply with the Superior Court orders."[26]

It appears that Lehman did not comply with the rules of discovery and the trial judge's order. That warrants the imposition of sanctions. But the dismissal with prejudice of a complaint for $119,989.45 plus interest, in response to which the defendant made an offer of judgment in the amount of $116,000, is too severe a sanction. Much of the noncompliance in this case can be attributed to Lehman's trial attorney's inept intraoffice communications. There is nothing in the record to support a finding that Lehman itself willfully or consciously disregarded the

17. *In re Rinehardt,* 575 A.2d 1079, 1082 (Del. 1990); *Tandy v. DCSE,* 894 A.2d 407, 2006 Del. LEXIS 89, at *5–6 (Del.2006) (Order); *See also Rittenhouse Associates v. Frederic A. Potts & Co., Inc.,* 382 A.2d 235, 236 (Del. 1977) ("[T]he issue is whether the Trial Court abused its discretion in ordering a dismissal.").

18. *Chavin v. Cope,* 243 A.2d 694, 695 (Del. 1968).

19. *In re Rinehardt,* 575 A.2d at 1082.

20. *Rittenhouse,* 382 A.2d at 236.

21. *Id.*

22. *Id.*

23. *Sundor Electric, Inc. v. E.J.T. Construction Co. Inc.,* 337 A.2d 651, 652 (Del.1975).

24. *Ritchie v. Loring,* 797 A.2d 1207 (Del.2002) (Order) (citing *In Re Rinehardt,* 575 A.2d at 1083) (emphasis added).

25. *Rittenhouse,* 382 A.2d at 236–37 (citing *Sundor,* 337 A.2d 651) (internal quotations omitted, brackets original).

26. *Id.* at 236.

Court's Rules or order. Lehman did furnish the responsive documents to its trial attorney beyond the time period provided in the discovery rules, but did so well before Lofland's attorney filed the motion that resulted in the Court's order compelling a response within fourteen days and deeming the requested admissions to have been made.

On September 20, 2004, the date that Lehman's trial counsel's secretary received the email with the discovery responses attached allegedly limiting Lehman's trial counsel's ability to respond, the trial judge had not yet entered his order compelling discovery. At some point before the trial judge granted Lofland's motion to compel on November 5, 2004, Lehman and its trial counsel must have agreed to a fee arrangement, because Lehman's trial counsel appeared at the hearing for the motion to compel and thereafter continued to represent Lehman. Lehman's counsel also partly responded to the discovery requests on November 3, 2004, which is further evidence that Lehman and its trial counsel had worked out their fee arrangement leaving Lehman with no basis to believe that its trial counsel had not forwarded the information that Lehman believed to be responsive to the outstanding discovery.

Lehman's September 20, 2004 email to its trial counsel specifically said "please do not take any action *prior* to fee approval...." That language was not an outright prohibition on delivering the discovery responses. *After* fee approval, and *before* and *after* the November 5, 2004 Court Order, Lehman's trial counsel was free to deliver those materials, and had his secretary timely informed him of the email, he no doubt would have done so. Although Lehman's trial counsel may have had difficulty communicating with a specific person at Lehman, the fact remains that on September 20, 2004, Federspiel sent documents responsive to Lofland's discovery requests to Lehman's trial counsel's secretary. In Lehman's trial counsel's own words, "the problem was that the initial e-mail ... went to a clerk in my office, not to me. Had it come to me, I would not be standing here now. I would have immediately delivered [it] to the opposing counsel." These facts are not even remotely consistent with a finding that Lehman willfully or consciously refused to comply with its discovery obligations.

Lehman's trial counsel's negative response to the trial judge's question—"did you ever get any response from your client as to when you could release these documents"—is a red herring. First, Lehman's trial counsel represented that he would have delivered the email to Lofland had he known of it, despite Federpiel's alleged instruction not to do so until the fee arrangement was finalized. Second, and more importantly, Federspiel's email is not an outright prohibition against counsel producing the discovery responses until counsel first received her or someone else from Lehman's affirmative consent to do so. As we read the record, once the parties finalized their fee agreement, Lehman's trial counsel could, would, and should have sent the responsive discovery documents to Lofland's counsel, had his office staff informed him that they had been received. Lehman's trial counsel should have had in place intraoffice communications adequate to ensure that he would be informed of Federspiel's email.

We find nothing in the record to suggest that Lehman itself willfully or consciously disregarded a Court order. In his Bench ruling, even the trial judge acknowledged as much: "I ordered that the plaintiff comply and plaintiff *may have made a conscious decision not to comply*...." While Lehman "may have" made a willful and conscious decision to disregard the

trial judge's order, the record does not support a finding that it in fact did so. Once Lehman delivered the materials to its trial attorney in September and finalized the fee arrangement sometime between September and November of 2004, it had no reason to believe that its trial attorney had not responded to Lofland's discovery requests. Moreover, simply missing the initial discovery deadline and having a witness fail to appear for trial under unexplained circumstances, again, on the facts of this case,[27] do not warrant dismissing this complaint with prejudice.

We conclude, for these reasons, that dismissal with prejudice was too severe and draconian a sanction given the less punitive and more appropriate sanctions that were available from the outset. This is particularly so, because Lofland essentially conceded that Lehman was entitled to recover $116,000 of a claim worth, at most, $145,551.61.[28] The trial judge's order dismissing the complaint would result in an astonishing windfall for Monroe's estate that would simply not be "just and reasonable."[29] Accordingly, we conclude that the trial judge's sanction dismissing Lehman's complaint and deeming the mortgage satisfied constituted an abuse of discretion.

The trial judge could have very readily "harshly" sanctioned Lehman and its counsel without entering an order that would result in an $116,000 plus windfall for Monroe's estate. The trial judge had an entire spectrum of lesser sanctions available that he could and should have considered before entering, *without any warning,* the ultimate sanction of dismissal with prejudice. For example, the trial judge could have directed Lehman to proceed to trial without its main witness on May 4th instead of continuing the trial until June 23rd. He could have refused to allow Lehman to present any evidence on damages beyond the principal acknowledged to be owed in the pretrial stipulation based on the discovery information Lofland did not receive until June 21st. He could have entered a judgment in Lehman's favor for the amount of Lofland's initial offer of judgment and assessed, against Lehman, Lofland's attorney's fees incurred to defend the action after Lofland's counsel filed his October 26, 2004 Motion to Compel.[30]

We deem this latter remedy appropriately "harsh" given the circumstances, yet not as unfairly draconian as the trial judge's order. Accordingly, we vacate the trial judge's order in part, reverse and remand with instructions to enter judgment for Lehman in the amount of $116,000. On remand, the trial judge shall order Lehman to pay Lofland's attorneys' fees incurred to defend this case after the October 26, 2004 Motion to Compel, including Lofland's expenses incurred to defend this appeal. We vacate the trial judge's order only in part because, after the trial judge enters the sanction set forth here, and the judgment is paid, Lehman will be obligated to satisfy the mortgage of record.

### CONCLUSION

For the foregoing reasons, we **VACATE** in part the Superior Court's September 27,

---

27. See *Rinehardt,* 575 A.2d at 1082 ("The decision whether to impose sanctions, upon whom to impose them, and what sanctions to impose, will depend upon the facts and circumstances of each particular case....").

28. The amount stated on the "Wendover Financial Services Corporation, Reverse Mortgage Loan History Breakdown" dated June 17, 2005.

29. Even Lofland's counsel conceded at oral argument that "having the mortgage thrown out" was a windfall for the estate.

30. See Sup.Ct. Civ. R. 37(b)(2).

2005 Order. This matter is **REVERSED** and **REMANDED** to the Superior Court with instructions to enter judgment for the Lehman in the amount of $116,000 consistent with Lofland's August 8, 2004 offer of judgment. The Court shall also assess against Lehman, Lofland's attorneys' fees incurred to defend this action after the October 26, 2004 Motion to Compel, including the expenses of this appeal. The trial judge shall determine the amount of the award of attorney's fees and how it shall be apportioned, if at all, between Lehman and Lehman's trial attorney.[31]

---

31. *See Rittenhouse*, 382 A.2d at 237; Sup.Ct. Civ. R. 37(b)(2) ("... In lieu of any of the foregoing orders or in addition thereto, the Court shall require *the party failing to obey the order or the attorney advising that party or* *both* to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the Court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.").