# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GLORIA JAMES, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 8931-VCL |
| NATIONAL FINANCIAL LLC, and LOAN TILL PAYDAY LLC, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: November 3, 2014
Date Decided: December 5, 2014

Richard H. Cross, Jr., Christopher P. Simon, CROSS & SIMON, LLC, Wilmington, Delaware; Alexander J. Pires, Jr., Diane E. Cooley, PIRES COOLEY, Washington, D.C.; *Attorneys for Plaintiff Gloria James and all others similarly situated*.

Edward T. Ciconte, Daniel Christopher Kerrick, CICONTE, ROSEMAN & WASSERMAN, Wilmington, Delaware; Kenneth Dubrow, THE CHARTWELL LAW OFFICES, LLP, Philadelphia, Pennsylvania; *Attorneys for Defendant National Financial LLC d/b/a Loan Till Payday LLC*.

**LASTER, Vice Chancellor.**

In May 2013, plaintiff Gloria James obtained a short-term, high-interest-rate loan from defendant National Financial LLC ("National"). After defaulting, James sued National on behalf of herself and a class of similarly situated borrowers, alleging that National's loan practices were unconscionable and its loan terms unenforceable.

During discovery, James asked National to provide information about the loans it made between September 20, 2010, and September 30, 2013, including the annual percentage rates ("APRs"). After National moved for a protective order, the court ordered National to produce certain categories of information, including the APRs. National produced a spreadsheet containing some of the categories but not others. When James checked the APRs against the few loan documents she had, they differed. When James deposed National's principal, who created the spreadsheet, he agreed that the data contained errors, and he gave other testimony that called into question the reliability of the spreadsheet.

James amended her complaint to add a claim that, by making loans without disclosing accurate APRs, National had violated the federal Truth in Lending Act (the "TILA"), 15 U.S.C. §§ 1601-1667f. She also moved to compel production of an updated spreadsheet containing accurate information. The court granted the motion and ordered National to produce an updated spreadsheet. The court also ordered National to retain a qualified information technology ("IT") consultant to assist National in exporting the data from its computer system and to provide James with an affidavit from the IT consultant attesting to the procedures used to populate the spreadsheet.

National produced what purported to be an updated spreadsheet, but the spreadsheet omitted information required by the court's order. National did not produce the affidavit. National instead provided James with a letter from an IT consultant that did not address the procedures used to populate the spreadsheet. The letter stated only that it would take many thousands of hours for the IT consultant to transfer paper records into electronic form. It thus answered a question that had not been asked, while failing to address the question that the court had ordered answered. After James objected to the form of the letter, National provided a notarized version.

James has moved for entry of a default judgment as a sanction against National for failing to comply with this court's order. Discovery taken in connection with the motion revealed that (i) National did not ask the IT consultant about populating the spreadsheet, (ii) the IT consultant did not know about the court's order or the requirement of an affidavit, (iii) the conversation with the IT professional about transferring records took about twenty minutes, and (iv) after James objected to the letter, National caused one of its employees to notarize the letter without the IT consultant's knowledge.

This decision holds that as a consequence of National's discovery misconduct, it is deemed established for purposes of trial that the APRs disclosed on the updated spreadsheet were incorrect and fell outside the tolerance permitted by the TILA. Because the positions National took in discovery were not substantially justified, this decision awards James the expenses, including attorneys' fees, that National's discovery failures caused her to incur.

# I.  FACTUAL BACKGROUND

The factual background is drawn from the pleadings and submissions made in connection with the earlier discovery motions and the current motion for sanctions. The discussion does not comprise findings of fact in the post-trial sense, but rather represents how the record appears at this preliminary stage.

## A.  The Loan

On May 7, 2013, James borrowed $200 from National, which does business in multiple locations in Delaware under the name Loan Till Payday LLC.[1] National is a Utah limited liability company that advertises, markets, and makes small-dollar, high-interest loans, which are referred to colloquially as "payday loans" because a borrower ostensibly repays the loan on the next payday.

James needed the $200 to pay for rent and groceries. The loan agreement, which consisted primarily of boilerplate provisions, imposed onerous terms. It contemplated *twenty-six* bi-weekly payments of $60 with a final balloon payment of $260. The total repayments add up to $1,620, for a cost of credit of $1,420 and an APR of 838.45%. James did not negotiate the terms of the loan. She avers that she did not understand the loan agreement fully.

James broke her hand on the day after she took out the loan, which limited her ability to work. She made the first $60 payment but missed the second. On June 14, 2013,

---

[1] James originally sued National and Loan Till Payday LLC, believing them to be separate entities. After discovery revealed that National does business under the name "Loan Till Payday LLC," the court instructed the parties to amend the caption to reflect this reality. Counsel agreed to do so, but they have not been able to accomplish this simple task.

National withdrew $63 from her bank account, comprising the agreed-to bi-weekly payment of $60 plus a $3 late fee. Ever since, James' inability to work has prevented her from making the bi-weekly payments.

## B. James Files Suit

Under National's standard loan agreement, which James signed, a borrower agrees to mandatory arbitration and waives any right to arbitrate on a class-wide basis. The loan agreement gives a borrower sixty days after signing the agreement to opt out of the mandatory arbitration provision.

On June 14, 2013, James sent National a letter opting out of mandatory arbitration. On September 20, 2013, James filed a verified class action complaint in this court against National on behalf of herself and similarly situated borrowers. She alleged that National's lending practices were unconscionable in light of the inequality of bargaining power between National and its customers, the use of boilerplate provisions in the loan documents, and the practice of charging delinquency payments and excessive interest rates. Count I sought a permanent injunction barring National from collecting on the loans made to James and other class members. Count II sought a declaration that the terms of National's loan documents were unenforceable. Count III alleged that National breached the implied covenant of good faith and fair dealing inherent in the loan agreements. Count IV alleged that National unjustly enriched itself at the expense of the class members. Count V alleged violations of the Delaware Consumer Fraud Act, 6 *Del. C.* §§ 2511-2527.

4

On October 10, 2013, National moved to compel arbitration and to dismiss the Complaint under the creative theory that James could not state a claim for a class action under Rule 23. This court denied the motion to dismiss, noting that James had opted out of arbitration and that National's arguments against class certification were premature.

At the time National moved to compel arbitration, National and its counsel[2] knew that James had opted out of arbitration. National and its counsel had made that point affirmatively as grounds for dismissal of an earlier action under the TILA that James filed in federal court. Because National and its counsel knew that their motion to compel arbitration had no factual basis, James moved for sanctions under Rule 11. The court granted the motion.

## C.    The First Discovery Order

After the denial of the motion to dismiss, James served document requests and interrogatories. Among other things, the discovery requests sought documents and information relating to the loans offered by National since September 20, 2010, including an electronic copy of the data from any database containing the loan information. National moved for a protective order, contending that the discovery was overbroad.

Although the court partially granted National's motion, finding that certain of James' requests were overbroad, the court's ruling required National to provide discovery

---

[2] Unless otherwise specified, references to National's counsel denote National's forwarding counsel. Although National's Delaware counsel has played a minimal, base-tending role that is inconsistent with the Court of Chancery's expectations, National's Delaware counsel does not appear to have participated actively in sanctionable discovery misconduct.

in response to other requests or narrowed versions of the requests. *See* Dkt. 44 (the "First Discovery Order"). Most pertinently, the First Discovery Order required National to provide the following information for the loans made between September 20, 2010, and September 30, 2013:

- The disbursement date of the loan.

- The type of contract.

- Where the loan was initiated (e.g., online, store location, etc).

- The APR.

- The finance charges (as identified on the loan agreement).

- The amount financed.

- The total amount of payments.

- The schedule for payments (weekly, bi-weekly, or monthly).

- The amount of money actually given to the customer, such that if the loan was a refinancing and the customer only received a portion of the funds, the amount the customer received.

- Whether the loan was a rollover or refinancing.

- Whether the customer had borrowed from National before.

- The total payments made by the customer on the loan.

- Whether the loan was paid off.

- Whether the loan was written off.

- Whether the loan was in default.

This decision refers to these categories as the "Loan History Information."

The court rejected National's argument that providing the Loan History Information was overly burdensome given National's failure to support its claim of

6

burden, the standardized nature of the loans, and the need for National to maintain and access loan data in the ordinary course of business and to meet regulatory requirements. The court noted that National could provide the Loan History Information in the form of a spreadsheet. The court expected that National had software that could spit out the information. National's counsel did not contend otherwise.

**D.     The Initial Spreadsheet**

On February 28, 2014, National produced an Excel spreadsheet that purported to provide the Loan History Information (the "Initial Spreadsheet"). Rather than only addressing the period covered by the First Discovery Order, the Initial Spreadsheet provided data for loans going back to January 1, 2006. This confirmed that the data was easily accessible and not burdensome to provide.

The Initial Spreadsheet included a column containing APRs, but the columns labeled "Schedule of Payments," "Total Amount of Payments," and "Finance Charges" were blank. The Initial Spreadsheet therefore did not provide James with all of the information required by the First Discovery Order or enable her to verify the APRs. Her counsel used the few loan documents she had to check the APRs. The figures on the Initial Spreadsheet did not match the loan documents.

James' counsel deposed National's principal, Timothy McFeeters. He testified that he created the Initial Spreadsheet himself, without assistance, by exporting data from National's software system. He explained that the software system had the ability to generate reports and that he could specify the categories to include in the report, such as the borrower's name, amount borrowed, amount repaid, APR, and other types of

information. He said that he picked which categories to export. He did not review the data for accuracy or have anyone else check it.

McFeeters acknowledged the discrepancies between the APRs on the Initial Spreadsheet and those in the loan agreements, but he offered no explanation other than it must have been an error on his part when exporting the data. McFeeters [1] at 96 ("Error on Tim."). He suggested that the errors might have occurred because the court ruled when issuing the First Discovery Order that National did not have to provide names of individual borrowers, so he had attempted to enter manually an identifying number for each individual borrower. National had approximately 10,000 customers and over 20,000 loans, making this a tedious task.

McFeeters also testified that the Delaware State Banking Commission (the "Banking Commission") had audited National between four and ten times after he purchased National in January 2013. He said the Banking Commission had expressed concern about inaccurate APRs. McFeeters testified that National changed its method of calculating APRs in response to the Banking Commission's concerns.

After deposing McFeeters, James' counsel asked National's counsel to provide an updated version of the Initial Spreadsheet. National's counsel agreed, but the updated version never followed. When James' counsel pressed the issue, National's counsel reneged, purportedly because McFeeters' deposition testimony adequately explained the reasons for the errors in the Initial Spreadsheet.

On May 6, 2014, James filed an Amended Verified Class Action Complaint (the "Amended Complaint"). The new pleading added Count VI, which alleged that National

8

violated the TILA by failing to disclose accurate APRs in its loan agreements. On June 10, James sought further discovery, including admissions from National that the APRs in its loan agreements executed between September 10, 2010, and December 31, 2013, fell outside the acceptable tolerance under the TILA.

## E.     The Second Discovery Order

On July 17, 2014, James moved to compel National to provide the Loan History Information. In connection with the motion to compel, James' counsel deposed McFeeters for a second time. During this deposition, McFeeters retreated from his earlier testimony that the discrepancies in the Initial Spreadsheet resulted from his own errors. Instead, McFeeters suggested that the discrepancies resulted from updates made by National's software provider, Infinity Enterprise Lending Software ("Infinity"), to the software National used.

In opposing the motion to compel, National's counsel sought to revisit whether the Loan History Information was relevant and to contend that production would be burdensome. He asserted that because the TILA imposes a one-year statute of limitations, Loan History Information should not be provided for loans issued more than one year before the date of the Amended Complaint. He did not argue that extracting the information from National's software was burdensome. Nor did he dispute that National's software kept track of the APRs and could export the figures.

The court held again that the Loan History Information was relevant and not burdensome to provide. Among other things, the court noted that it had ordered National to produce Loan History Information pursuant to the First Discovery Order, before James

ever asserted a TILA claim. The information was relevant and discoverable in light of James' claims about National's unconscionable business practices. The information also was relevant under the TILA to whether National acted with *scienter*.

After granting the motion to compel, the court entered an order requiring National to provide accurate Loan History Information. Dkt. 120 (the "Second Discovery Order"). The Second Discovery Order directed National to produce an updated version of the Initial Spreadsheet. It specified that the updated version "shall contain accurate calculations of the APR for each loan and shall populate with information the columns labeled 'Finance Charges,' 'Total Amount of Payments,' and 'Schedule of Payments' sufficient to support the calculation of the APR." *Id.* ¶ 1. The Second Discovery Order required that the updated version "be produced in native form so that Plaintiff can verify the formulas and calculations." *Id.* ¶ 2.

In light of McFeeters' testimony about how he personally prepared the Initial Spreadsheet, the Second Discovery Order required National to employ an IT consultant who could extract the data in an efficient and accurate manner, without requiring manual inputs. The Second Discovery Order stated:

> In preparing and producing this spreadsheet, Defendant shall employ a qualified IT consultant who can extract the data from the Defendant's system and import it into the spreadsheet in useable form. The IT consultant shall provide the plaintiff with an affidavit describing the procedures followed. The Defendant shall maintain the underlying records and data used to create the spreadsheet so that they can be reviewed, if necessary.

*Id.* ¶ 4. The Second Discovery Order did not require that the IT consultant be independent or limit the ability of National or its counsel to interact with the IT consultant.

10

**F. The Updated Spreadsheet**

On September 29, 2014, National's counsel purported to comply with the Second Discovery Order by emailing James' counsel an Excel spreadsheet (the "Updated Spreadsheet") and a letter from neXVel Solutions ("neXVel"). The cover email stated:

> Attached is a letter from neXVel Solutions, the IT company employed by defendant to assist in the revision of the Excel spreadsheet, relative to the above matter. As I earlier advised, the APR's [sic] appearing on the loan agreements, themselves, are not part of the computer system and are not in digital format.
>
> I am asking that you please accept the attached letter in lieu of an affidavit; however, if an affidavit is required, I can arrange for same.

Motion Ex. 5.

The letter from neXVel did not address the creation of the Updated Spreadsheet or the extraction of data from National's computer system. It instead addressed the creation of a new database from paper documents. The text read as follows:

> Thank you for the opportunity to assist you in managing and converting your loan records.
>
> After auditing your existing loan documents by Infinity Software [sic], we have determined the following:
>
> > 1.) Your current loan contracts and records that we evaluated and asked us [sic] to convert to excel [sic] are not in any digital format.
> >
> > 2.) There is no automated way to properly and easily convert these paper records into excel [sic] or any table based [sic] software without avoiding a timely manual process.
> >
> > 3.) Any manual data entry process could take an average of 30 minutes per contract based on the amount of manual data entry needed. Taking into consideration [sic] you have over 33,000 plus [sic] loans it would in theory take 16,500 man hours or 687.50 Days [sic] to manually input this data.

Attached to this letter is an invoice for our time and we hope that our analysis assists you moving forward.

*Id.*

After James' counsel explained that the neXVel letter did not comply with the Second Discovery Order, National's counsel responded with the following email:

> I am informed that National Financial's software company will not allow access by an outside IT consultant. Please see the e-mail below from Infinity to McFeeters, confirming same. This is why we had difficulty obtaining the affidavit although I am told McFeeters is still attempting to obtain an affidavit.

*Id.* Ex. 6. The statement that National's software vendor would "not allow access by an outside IT consultant" differed in substance from his earlier representation that neXVel had been "employed by defendant to assist in the revision of the Excel spreadsheet, relative to the above matter." According to the earlier representation, neXVel actually assisted with the process as contemplated by the Second Discovery Order. According the later representation, neXVel was not permitted to assist.

The email from National's counsel contained the following text, ostensibly backing up his representation:

> From: **Shaye Friedman** <shaye@infinityels.com>
> Date: Mon, Sep 29, 2014 at 4:06 PM
> Subject: Report
> To: Tim McFeeters <tim@loantillpaydaydelaware.com>
>
> Hello Tim,
>
> As far as I can tell the data in the attached report looks accurate. Unfortunately, we do not allow outside sources to program or develop in our software.
>
> Let me know if you have any questions or concerns.

Regards,

Shaye

*Id.* Other than the email address, there was nothing to suggest that Friedman actually worked for Infinity, what her title and position were, or whether she knew about the Second Discovery Order or what National and neXVel were required to do.

The Friedman email did not suggest that Infinity would not permit a third-party IT consultant to use Infinity's software to export data, as McFeeters had done. The email said only that Infinity would not permit an outside source "to program or develop in our software." The email therefore did not provide a justification for National's failure to retain an IT consultant to assist in extracting and providing the data.

The claim that Infinity would "not allow outside sources to program or develop in our software" conflicted with National's interrogatory responses, which averred that National previously used Compliance Services, Inc. ("CSI") to modify its software. According to one response,

> **[o]n or about July 26, 2013**, National contracted with [CSI] to assist National in resolving any inaccuracies associated with the APR's [sic] reflected on National's loan agreements including, without limitation, identifying the source of any inaccuracies, or perceived inaccuracies, *and adjusting National's software accordingly . . . .* Through the efforts of CSI, National changed the calculations of its APR's [sic] from a block rate to a daily rate *and adjusted its software accordingly upon which it continued to rely.*

Opposition Ex. C at 2 (second and third emphasis supplied). Yet if the Friedman email was accurate, then Infinity should not have permitted CSI to "adjust" its software.

13

More importantly, the representation by National's counsel that the APR calculations "were not part of [National's] computer system and are not in digital format" conflicted with at least two of National's interrogatory responses and McFeeters' earlier testimony. The interrogatory response quoted above stated that National relied on its software to make the APR calculations. That was how McFeeters testified during his second deposition, when he contended that changes to the software generated the erroneous APRs in the Initial Spreadsheet. National adopted this account in another interrogatory response, which stated:

> [After his deposition on April 23, 2014], McFeeters contacted [Infinity], the computer and/or software company which supplied and maintained National's computer software, inquiring why the annual percentage rates ("APR's") [sic] reflected on several of National's loan agreements differed from the APR reflected in the computer data. *McFeeters was informed that as Infinity made changes and/or updates to the software, APR data would change.* Thus, while McFeeters initially believed the discrepancies between the APR's [sic] reflected on the loan agreements *and in the computer data* was [sic] solely his error, he subsequently determined that this was not necessarily the reason, but that the data was altered by Infinity.

*Id.* at 3 (emphasis added).

James' counsel continued to press National about providing an affidavit. Rather than doing so, National's counsel provided a version of the neXVel letter with a notary stamp. When James' counsel asked National's counsel directly about the role neXVel played in preparing the Updated Spreadsheet, National's counsel claimed not to know. National's counsel then took the position that he had tried to stay out of the process of preparing the Updated Spreadsheet because the Second Discovery Order required that the IT consultant be "independent," and he thought that if he inserted himself in the process,

14

it would undermine the consultant's independence. Nothing in the Second Discovery Order spoke in terms of independence or required that the IT consultant be neutral. The Second Discovery Order required that National employ a "qualified" IT consultant to help McFeeters export the data required by the First and Second Discovery Orders. McFeeters chose to prepare the Updated Spreadsheet himself.

## G.    The Motion For Sanctions

On October 2, 2014, James moved for entry of a default judgment against National as a sanction for National's violation of the Second Discovery Order. Alternatively, James sought a deemed admission that the APR calculations for the loans on the Updated Spreadsheet fell outside the range of tolerances established by the TILA.

On October 16, 2014, National's counsel told James' counsel that he wanted to withdraw the neXVel letter on the ground that Chad Cushner, whose signature appeared on the letter, had not signed in the presence of the notary. The notary who provided the notarization is a National district manager and, ironically, responsible for training employees on proper procedures. National's counsel wrote the court to raise the issue and to express his concern that "this impropriety may have compromised [his] ability to serve as Defendant's counsel." Dkt. 132. At the request of National's counsel, the court held a teleconference on October 21 during which National's counsel reiterated these points. The court declined to make an advisory ruling regarding counsel's ethical obligations.

After the teleconference, James deposed Cushner, whom neXVel had identified as its Rule 30(b)(6) witness. Cushner testified that McFeeters met with neXVel for approximately one hour on September 24, 2014, and that perhaps twenty minutes was

spent discussing the effort involved in converting hard copy documents to a digital format. McFeeters did not mention the Second Discovery Order, much less provide a copy. McFeeters did not explain that National had been ordered to retain an IT consultant to assist in extracting data from National's software system and using it to populate an Excel spreadsheet. Cushner testified that National never gave neXVel an opportunity to look at its software or to speak to anyone from Infinity. Cushner made clear that neXVel was not involved in preparing the Updated Spreadsheet. Cushner testified that neXVel billed McFeeters $60 for the entire meeting, suggesting that McFeeters paid approximately $20 for neXVel's advice about converting hard-copy documents into digital format.

Cushner testified that McFeeters asked neXVel to sign the letter after their initial meeting. Cushner confirmed that no notary was present when he signed the letter, that he did not know how the letter came to be notarized, and that he had not seen the notarized letter until October 29, 2014, during his deposition. Cushner had not known that the Second Discovery Order required National to provide an affidavit from an IT consultant or that National would be using his letter for that purpose.

## II.     LEGAL ANALYSIS

"Candor and fair-dealing are, or should be, the hallmark of litigation and required attributes of those who resort to the judicial process. The rules of discovery demand no less." *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999). "Discovery abuse has no place in [Delaware] courts, and the protection of litigants, the public, and the bar demands nothing less than that [Delaware] trial courts be

16

diligent in promptly and effectively taking corrective action to 'secure the just, speedy and inexpensive determination of *every* proceeding' before them." *Holt v. Holt*, 472 A.2d 820, 824 (Del. 1984) (quoting Rule 1; emphasis in original).

> Trial courts should be diligent in the imposition of sanctions upon a party who refuses to comply with discovery orders, not just to penalize those whose conduct warrants such sanctions, but to deter those who may be tempted to abuse the legal system by their irresponsible conduct.

*Hoag v. Amex Assurance Co.*, 953 A.2d 713, 717 (Del. 2008) (internal quotation marks omitted).

"In the event this Court determines that sanctions for discovery abuses are appropriate, the sanction must be tailored to the culpability of the wrongdoer and the harm suffered by the complaining party." *Cartanza v. Cartanza*, 2013 WL 1615767, at *2 (Del. Ch. Apr. 16, 2013), *reargument denied*, 2013 WL 3376964 (Del. Ch. July 8, 2013). A trial court "has the power to issue sanctions for discovery abuses under its inherent equitable powers, as well as the Court's inherent power to manage its own affairs." *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1189 (Del. Ch. 2009) (internal quotation marks omitted); *see Hoag*, 953 A.2d at 716-17 (noting court's authority to impose sanctions for discovery abuse under Rule 37 or pursuant to its "inherent authority").

Rule 37(b)(2) identifies potential sanctions that a trial court can impose for violating a discovery order, including but not limited to:

> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

17

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence; [or]

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.]

Ch. Ct. R. 37(b)(2).

Delaware Supreme Court decisions teach that the entry of a default judgment under Rule 37(b)(2)(C) is "*the ultimate sanction* for discovery violations and *should be used sparingly*." *Lehman Capital v. Lofland*, 906 A.2d 122, 131 (Del. 2006) (emphasis in original) (internal quotation marks omitted). "[A] default judgment should be granted if no other sanction would be more appropriate under the circumstances." *Hoag*, 953 A.2d at 717. "Judgment by default is, of course, the extreme remedy and generally speaking the Rule has been interpreted to require some element of willfulness or conscious disregard of the order before such a sanction is imposed." *Sundor Elec., Inc. v. E.J.T. Constr. Co.*, 337 A.2d 651, 652 (Del. 1975) (internal quotation marks omitted).

A less final but still serious discovery sanction is the entry of an order under Rule 37(b)(2)(A) that deems designated facts to be established or which draws an inference as to a particular issue that is adverse to the party that failed to comply with its discovery obligations. Delaware decisions have granted adverse inferences in cases involving the spoliation of documents, where the evidence indicates that the party acted with a culpable metal state. *See Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 548 (Del. 2006); *see*

18

*also Collins v. Throckmorton*, 425 A.2d 146, 150 (Del. 1980) (noting adverse inference would be appropriate for spoliation).

A more moderate but still significant discovery sanction is to alter the burden of proof on a particular issue, either by shifting it to the party that failed to comply with its discovery obligations or by increasing or decreasing the relevant standard. *See TR Investors, LLC v. Genger*, 2009 WL 4696062, at *2 (Del. Ch. Dec. 9, 2009) (Strine, V.C.). In *Genger*, the defendant authorized a computer consultant to erase computer files in direct violation of a status quo order. Despite concluding that the defendant intentionally spoliated evidence in violation of a court order, Chief Justice Strine, writing as a Vice Chancellor, declined to impose "the extreme remedy of a default judgment." *Id.* at *19. Choosing instead to "deprive [the defendant] of the advantages of any evidentiary gaps that his own misbehavior might have been caused," the Chief Justice elevated the defendant's burden of proof by one level, increasing it from a preponderance of the evidence to clear and convincing evidence. *Id.* In addition, because the defendant's conduct created serious doubts as to his credibility, the Chief Justice held that the defendant would not be able to establish any material facts by relying solely on his own testimony; he only would be able to establish material facts if he could point to other, additional evidence to corroborate his account. *Id.*

Rule 37(b)(2) further provides that if a defendant has violated a discovery order, the court "*shall* require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure." Ch. Ct. R. 37(b)(2) (emphasis added). Under this rule, expenses should be

19

awarded "unless the Court finds that the failure was substantially justified or that other circumstances made an award of expenses unjust." *Id.* The Delaware Supreme Court has explained that under Rule 37, "when a party fails to comply with discovery orders of the Court or otherwise engages in discovery abuses, the award of attorneys' fees and expenses to the opposing party is mandatory, absent a showing by the wrongdoer that his actions were substantially justified or that other circumstances make the award unjust." *Bader v. Fisher*, 504 A.2d 1091, 1096 (Del. 1986); *accord Holt*, 472 A.2d at 823.

The presumptive nature of the award under the current version of Rule 37(b)(2) represented a change from prior practice. In 1970, the federal rules were revised to introduce this approach "in order to encourage such sanction under such circumstances and to that end the Rule places a burden on the disobedient party to show that his failure was justified or that the other circumstances exist making an award unjust." *Wileman v. Signal Fin. Corp.*, 385 A.2d 689, 690-91 (Del. 1978) (citation omitted).

> A major purpose of the 1970 revision of the discovery rules was to encourage extrajudicial discovery with a minimum of court intervention. One means of accomplishing that was to tighten the judicial sanctions with respect to unjustified insistence upon or objection to discovery. This led the draftsmen to place new emphasis on the availability and compulsory nature of an award of expenses. The potential availability of the award of expenses and fees was therefore broadened.

8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE & PROCEDURE § 2288 (3d ed. 2010) (citations omitted). The revision represented "an attempt to induce courts to make the award more frequently." *Id.* § 2281 (citations omitted). Rule 37(b)(2) was amended in 1970 to follow the federal model. *See Wileman*,

385 A.2d at 690. As with its federal counterpart, Rule 37 was revised "to encourage such sanctions where appropriate." *Bader*, 504 A.2d at 1096.

## A. The Discovery Violations

National violated the First Discovery Order and the Second Discovery Order. Its discovery misconduct has been serious. National not only failed to produce required information; it also provided a series of evolving explanations about why the information was not produced accurately. It is impossible to reconcile National's various explanations.

The First Discovery Order required that National provide information for the loans it made between September 20, 2010, and September 30, 2013, including the APRs, the finance charges, the schedule for payments, and the total payments made by the borrower. National failed to comply with the First Discovery Order when it produced the Initial Spreadsheet. The Initial Spreadsheet omitted information from the columns labeled "Schedule of Payments," "Total Amount of Payments," and "Finance Charges," and the APRs were not accurate.

The Second Discovery Order required that National produce accurate Loan History Information in the form of the Updated Spreadsheet. In light of McFeeters' self-described technological limitations, the Second Discovery Order required that National retain a qualified IT consultant to assist with extracting the data and creating the Updated Spreadsheet. The Second Discovery Order ordered the IT consultant to provide an affidavit attesting to the procedures it followed. National violated the Second Discovery Order in three ways. The Updated Spreadsheet did not contain all of the required

21

information. It lacked accurate APRs. And National failed to retain a qualified IT consultant and provide the required affidavit.

National is responsible for its discovery violations. When responding to the First Discovery Order, McFeeters knew the specific information that he was obligated to produce. Despite being able to export this information from the Infinity software system, he chose not to select all of the required fields. The Initial Spreadsheet did not provide the finance charges, schedule of payments, or total amount of payments. The Initial Spreadsheet provided APRs, but did not include the information necessary for James to verify the calculations. For those APRs where James had the underlying loan documents, the figures did not match.

When responding to the Second Discovery Order, McFeeters again knew the specific information that he was obligated to produce, and he knew he was required to retain an IT consultant to assist him and provide an affidavit describing the procedures that were followed. He did not retain an IT consultant, did not produce the information, and did not provide the affidavit.

National's discovery violations were not isolated events, but rather part of a pattern. This case began with National and its counsel filing an unfounded motion to compel arbitration, despite knowing that James had opted out of the arbitration agreement. That motion resulted in James moving for Rule 11 sanctions, which this court granted. National next sought a protective order against virtually all discovery, and although the court granted the protective order in part, the First Discovery Order required National to produce a range of materials, including the Loan History Information.

22

National failed to comply with the First Discovery Order, leading to the Second Discovery Order. National failed to comply with the Second Discovery Order, leading to the motion for sanctions.

National's discovery violations appear to have been willful. In addition to the recurring nature of the violations, National has changed position repeatedly and offered inconsistent explanations. National originally asserted that the errors in the APRs on the Initial Spreadsheet were due to mistakes by McFeeters, and National's counsel agreed to produce a corrected version. He reneged. After James filed the second motion to compel, National changed position and claimed that its software package caused the mistakes in the APRs. McFeeters testified to that effect, and National's interrogatory responses espoused that version of events. Then, when the Second Discovery Order specifically called for National to produce the APRs and show how they were calculated, National claimed that its software did not maintain the APRs.

The events surrounding the neXVel letter further evidenced the casual relationship that National and its counsel seem to have with the truth. When National's counsel originally provided the Updated Spreadsheet, his email did not suggest in any way that neXVel had not been able to assist with the data or in its preparation. He referred to neXVel as "the IT company employed by defendant to assist in the revision of the Excel spreadsheet."

In a separate email, National's counsel sent the letter from neXVel. The contents of the letter told a different story. The letter was not an affidavit, and it did not identify any procedures followed by neXVel. It sounded like a quote for work. When James'

counsel pressed for an affidavit, National's counsel sent a notarized version of the letter. It later turned out that the letter had not been signed in the presence of the notary, and neXVel's Rule 30(b)(6) witness did not know how the letter came to be notarized.

The failure to meet the requirements for a valid notarization is a serious issue. "[T]he requirement that the person whose signature is to be notarized personally appear[] before the notary is both clear and readily accessible to anyone who undertakes any sort of effort to find out." *Bessenyei v. Vermillion, Inc.*, 2012 WL 5830214, at *8 (Del. Ch. Nov. 16, 2012) *aff'd*, 67 A.3d 1022 (Del. 2013); *accord Basic Notarial Duties*, AMERICAN SOCIETY OF NOTARIES, http://www.asnnotary.org/?form=basicduties (recognizing that "the 'golden rule' of every notarial act, whether it is paper-based or electronic, is the physical presence of the signer before the notary."). Pennsylvania currently follows the Notary Public Law and Uniform Acknowledgment Act,[3] which requires a notary to "know through personal knowledge or have satisfactory evidence that the person appearing before the notary is the person described in and who is executing

_____

[3] In October 2013, the Pennsylvania General Assembly adopted the Revised Uniform Law on Notarial Acts ("RULONA"), which will take effect after the Pennsylvania Department of State has approved basic and continuing notary education courses. *See* New Pennsylvania Notary Public Law (Dec. 5, 2013) (noting that "Pennsylvania notary public practice and procedure will most likely not take effect until 2015."), *available at* http://www.portal.state.pa.us/portal/http;//www.portal.state.pa.us;80/portal/http;/www.portal.stat e.pa.us;80/portal/server.pt/gateway/PTARGS_0_244608_1372259_0_0_18/Preliminary%20web site%20posting%20for%20when%20RULONA%20passes.pdf. Like the current Pennsylvania notary statute, RULONA requires the signer's personal presence before a notary. *Compare* 57 Pa.C.S. § 158.1 ("The officer notarizing the instrument shall know through personal knowledge or have satisfactory evidence that the person appearing before the notary is the person described in and who is executing the instrument.") *with* 57 Pa.C.S. Ann. § 306 ("If a notarial act relates to a statement made in or a signature executed on a record, the individual making the statement or executing the signature shall appear personally before the notarial officer.").

the instrument." 57 Pa.C.S. § 158.1. "Under Pennsylvania law, [the signer's] failure to appear before [the notary] at the time the notarizations took place renders the notarizations invalid."[4]

When James' counsel put National's counsel on the spot about neXVel's role, National's counsel claimed ignorance. He asserted for the first time that he tried to stay out of the process of preparing the Updated Spreadsheet because the Second Discovery Order required that the IT consultant be "independent." But the order did not impose that requirement. Then, during the hearing on the motion for sanctions, National's counsel offered a different explanation: "I have to confess to this Court, I am not computer literate. I have not found presence in the cybernetic revolution. I need a secretary to help me turn on the computer. This was out of my bailiwick."

Professed technological incompetence is not an excuse for discovery misconduct. Effective March 1, 2013, the Delaware Supreme Court amended Comment 8 to Rule 1.1 of the Delaware Lawyers' Rules of Professional Conduct, which addresses competence, to include maintaining technological competence. The new comment states that "a lawyer should keep abreast of changes in the law and its practice, *including the benefits and risks*

---

[4] *Bessenyei*, 2012 WL 5830214, at *4; *accord In re Petition of Valenty*, 43 A.3d 464, 466 (Pa. 2012) (explaining that "an affiant must actually appear in person before the notary to swear and subscribe to the facts in the affidavit, if the affidavit is to be valid"); *In re Bokey's Estate*, 194 A.2d 194, 198 (Pa. 1963) ("The essence of the notarial certificate is that the document has been executed, and that the notary knows that he is confronted by the signer, and that the signer is asserting the fact of his execution"); *Leyda v. Norelli*, 564 A.2d 244, 246 (Pa. Super. Ct. 1989) ("[N]otarization certifies the fact of execution by a person who purports to be the signer").

*associated with relevant technology . . . .*"[5] This language finds parallels in the Pennsylvania Rules of Professional Conduct, where National's counsel is admitted to practice, and the Model Rules of Professional Conduct. *Compare id. with* Pa. Rules of Prof'l Conduct R. 1.1 cmt. 8 *and* Model Rules of Prof'l Conduct R. 1.1 cmt. 8. "[D]eliberate ignorance of technology is inexcusable . . . . [I]f a lawyer cannot master the technology suitable for that lawyer's practice, the lawyer should either hire tech-savvy lawyers tasked with responsibility to keep current, or hire an outside technology consultant who understands the practice of law and associated ethical constraints." Judith L. Maute, *Facing 21st Century Realities*, 32 Miss. C. L. Rev. 345, 369 (2013). Legal publications in Delaware and Pennsylvania have discussed the amendments to Rule 1.1 in similar terms.[6]

In light of this record, the court is forced to conclude that National and its counsel willfully disregarded their discovery obligations and sought to mislead James and her

---

[5] Del. Lawyers' Rules of Prof'l Conduct R. 1.1 cmt. 8 (emphasis added). The citation to Rule 1.1 is not meant to suggest that this court has made any determination regarding a potential ethical violation. That question is reserved for the appropriate supervisory authorities. *See Crumplar v. Superior Court ex rel. New Castle Cnty.*, 56 A.3d 1000, 1009 (Del. 2012) ("Absent conduct that prejudicially disrupts the proceeding, trial judges have no independent jurisdiction to enforce the Rules of Professional Conduct."); *In re Infotechnology, Inc.*, 582 A.2d 215, 216-17 (Del. 1990) (explaining that absent conduct prejudicial to the proceeding, enforcement of Rules of Professional Conduct must be left to authorities who oversee the bar). This decision has cited Comment 8 only to illustrate the inadequacy of the most recent explanation for non-compliance provided by National's counsel.

[6] *See* Steven L. Butler, *Securing Your Mobile Device*, Del. Law., Fall 2014, at 20, 21; Bruce E. Jameson, *Technology Competence for Lawyers: Not an Oxymoron*, Del. Law., Fall 2014, at 16; Kelly Phillips Erb, *You Can't Hide from Technology*, Pa. Law., May/June 2014 56, 56.

counsel. Sadly, National's Delaware counsel bears some responsibility for the current situation. Even when forwarding counsel has been admitted *pro hac vice* and is taking a lead role in the case, the Court of Chancery does not recognize the role of purely "local counsel." *State Line Ventures, LLC v. RBS Citizens*, 2009 WL 4723372, at *1 (Del. Ch. Dec. 2, 2009). "The admission of an attorney *pro hac vice* shall not relieve the moving attorney from responsibility to comply with any Rule or order of the Court." Del. Ch. Ct. R. 170. "Our rules make clear that the Delaware lawyer who appears in an action always remains responsible to the Court for the case and its presentation." *State Line Ventures*, 2009 WL 4723372, at *1; *accord Hsu v. Great Seneca Fin. Corp.*, 2010 WL 2635771, at *4 (Del. Super. June 29, 2010), *aff'd*, 9 A.3d 476 (Del. 2010). "As officers of this Court, [] Delaware lawyers are ultimately responsible for the documents they file with the Court and serve on the [opposing party]." *Bessenyei*, 2012 WL 5830214, at *7. As such, "Delaware counsel are expected to police the behavior of their out-of-state colleagues and ensure that out-of-state counsel understand the standards expected by Delaware courts." Brian Cheffins, *et al.*, *Delaware Corporate Litigation and the Fragmentation of the Plaintiffs' Bar*, 2012 Colum. Bus. L. Rev. 427, 463 (2012).

This expectation is particularly important during discovery. The court expects Delaware counsel to play an active role in the discovery process, including in the collection, review and production of documents. If Delaware counsel does not directly participate in the collection, review and production of documents, then at a minimum Delaware counsel should discuss with co-counsel the court's expectations.

In this case, Delaware counsel does not appear to have participated in the discovery violations. Rather, Delaware counsel failed to stay meaningfully involved in the case. There have been a series of indications that caused the court to suspect that Delaware counsel saw itself as a mail drop, and on at least two occasions, the court cautioned Delaware counsel off the record about the need to play a more substantive role. Delaware counsel does not appear to have heeded those warnings. Had Delaware counsel been more involved, the current regrettable situation might have been avoided.

## B. The Appropriate Sanction

National's discovery misconduct calls for serious measures. Although I believe that entry of a default judgment would be warranted on these facts, I will not grant that remedy in light of the Delaware Supreme Court's guidance about invoking the ultimate sanction and the availability of less punitive consequences.

As Chief Justice Strine noted while crafting the sanction in *Genger*, a lesser sanction should "deprive [the defendant] of the advantages of any evidentiary gaps that his own misbehavior might have been caused." 2009 WL 4696062, at *19. Here, as in *Genger*, National's conduct deprived James of the benefit of accurate Loan History Information. At this point, the court lacks confidence that McFeeters and his counsel can or will provide accurate information. To address this failure, an appropriate sanction is an "order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order." Ch. Ct. R. 37(b)(2)(A). For purposes of trial,

28

therefore, it is deemed established that the APRs for the loans disclosed on the Updated Spreadsheet fell outside the acceptable range set forth in the TILA.

The deemed admission is not case dispositive. National's counsel has expounded on National's multiple defenses and arguments, including the prospective testimony of an expert who will explain that APRs are inherently unreliable. James still must carry her burden of persuasion, and National still can rely on its other defenses. What National cannot do any longer is contend that the APRs were accurate.

## C. Fees And Expenses

Rule 37 contemplates a presumptive award of expenses, including attorneys' fees, "unless the Court finds that the failure was substantially justified or that other circumstances made an award of expenses unjust." Ch. Ct. R. 37(b)(2). James seeks her expenses for (i) preparing for and responding to National's motion for protective order, (ii) reviewing the Initial Spreadsheet and taking the first deposition of McFeeters, (iii) preparing for and arguing her motion to compel, (iv) reviewing the Updated Spreadsheet, (v) taking the second deposition of McFeeters, and (vi) preparing for and arguing the current motion for sanctions. Although not specifically mentioned, the Rule 30(b)(6) deposition of neXVel falls within the scope of her request.

National's failure to comply with the Second Discovery Order was not substantially justified. National did not follow the procedures set forth in the Second Discovery Order and did not produce the information that the Second Discovery Order required. National tried to mislead James into believing that it had attempted in good faith to extract data from its computer system with neXVel's assistance. Only after James

29

pressed the issue did National and its counsel backpedal. The excuses offered by National's counsel conflicted with positions National had taken earlier and with his professional obligations.

Although James is entitled to her expenses, she has sought too expansive an award. Rule 37(b)(2) contemplates an award of the "reasonable expenses, including attorney's fees, caused by the failure" to obey a discovery order. The court did not shift fees or expenses in connection with National's motion for protective order or the motion to compel, and those rulings will not be revisited. James is entitled to the fees and expenses she incurred after the entry of the Second Discovery Order, including in connection with the review of the Updated Spreadsheet, the motion for sanctions, the second deposition of McFeeters, and the Rule 30(b)(6) deposition of neXVel. Each of those categories of expenses was caused by National's failure to comply with the Second Discovery Order.

Rule 37(b)(2) authorizes the court to require that the expenses be paid by "the party failing to obey the order or the attorney advising that party or both." Given the roles played by both McFeeters and National's counsel, the answer here is both.

James shall file a Rule 88 affidavit identifying her expenses and providing supporting documentation. James also shall submit a proposed form of order. If National disputes any of the expenses, then National shall file an opposition within two weeks. James shall have one week to reply.

## III.     CONCLUSION

The motion for sanctions is granted. It is deemed established for purposes of trial that the APRs for the loans disclosed on the Updated Spreadsheet were incorrect and fell outside the tolerances set forth in the TILA. James is awarded her expenses, including attorneys' fees, incurred due to National's failure to comply with this court's order.