**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| BDO USA, LLP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N22C-12-063 KSM CCLD |
| | ) | |
| EVERGLADE GLOBAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Date Submitted:  December 7, 2022
Date Decided:  January 31, 2023

Ethan Townsend, Kevin M. Regan, Ashley R. Altschuler, McDERMOTT WILL & EMERY LLP, Wilmington, Delaware; Michael J. Sheehan, McDERMOTT WILL & EMERY LLP, Chicago, Illinois; Russell Hayman, McDERMOTT WILL & EMERY LLP, Los Angeles, California; Sarah E. Walters, McDERMOTT WILL & EMERY LLP, Boston, Massachusetts; *Counsel for Plaintiff BDO USA, LLP*.

Julia B. Klein, KLEIN LLC, Wilmington, Delaware; Lita Beth Wright, AMINI LLC, New York, New York; *Counsel for Defendant EverGlade Global, Inc.*

**McCORMICK, C.[1]**

---

[1] Sitting as a Judge of the Superior Court of the State of Delaware by special designation of the Chief Justice of the Supreme Court of Delaware pursuant to Del. Const. Art. IV § 13(2).

This decision enters default judgment in favor of the plaintiff due to the defendant's egregious acts of spoliation. In March 2021, Plaintiff BDO USA, LLP ("BDO") filed suit against Defendant EverGlade Global, Inc. ("EverGlade") to enjoin a smear campaign allegedly carried out by EverGlade and non-party Eric Jia-Sobota. Court-ordered discovery revealed that Jia-Sobota spoliated massive amounts of evidence. BDO moved for sanctions in the form of a default judgment and fee-shifting. In response, EverGlade admitted that Jia-Sobota engaged in spoliation but attempted to distance itself from Jia-Sobota, who is EverGlade's founder, controlling stockholder, board chairman, and CEO. The court held an evidentiary hearing to evaluate EverGlade's role in the spoliation (the "Sanctions Trial"). This decision holds that Jia-Sobota acted on behalf of EverGlade in spoliating evidence and that the only fair and just outcome is a default judgment and fee-shifting in favor of BDO.

## I. FACTUAL BACKGROUND

The Sanctions Trial took place over two days. As reflected in the Schedule of Evidence submitted by the parties, the record comprises 340 joint exhibits, live testimony from three fact witnesses, and deposition testimony from nine fact witnesses.[2] The factual findings address the acts of spoliation; they do not reach the merits of Plaintiff's claims.

---

[2] This decision cites to: C.A. No. 2021-0244-KSJM docket entries (by "Dkt." number); trial exhibits (by "JX" number); the Sanctions Trial transcript (Dkts. 299–300) ("Sanctions Trial Tr."); and deposition transcripts as "[Last Name] Dep. Tr." The parties lodged the deposition transcripts of the following witnesses: Eric Jia-Sobota, Julian Ackert, Paul Argy, Daniel Barak, Matthew Franz, Jerry Jia-Sobota, Daniel Roffman, Andrea Wilson, and EverGlade's Rule 30(b)(6) representative, Julie Roy. Because Eric Jia-Sobota was deposed on four separate dates, the court cites to the transcripts of his depositions as "Jia-Sobota [Date] Dep. Tr."

### A.    The Smear Campaign

Jia-Sobota is a former BDO partner who started a rival consulting firm, EverGlade, in the spring of 2020 while still at BDO.  After Jia-Sobota's departure from BDO, in May 2020, BDO initiated arbitration proceedings and filed a related action for injunctive relief in aid of arbitration against Jia-Sobota and EverGlade in the Superior Court of the District of Columbia, alleging that Jia-Sobota breached the BDO partnership agreement.[3]  The D.C. litigation placed significant financial pressure on EverGlade.[4]  A downturn in EverGlade's business intensified that pressure.[5]  In October 2020, EverGlade was forced to reduce its workforce.[6]  EverGlade's investors and Board members, Paul Argy and Matt Franz, began to demand the return of their investment.[7]  EverGlade even ran out of cash, leading Jia-Sobota to loan it $180,000.[8]

Jia-Sobota was EverGlade's founder, controlling stockholder, CEO, and Board chair.  As CEO, Jia-Sobota was responsible for responding on EverGlade's behalf to the risks posed by the D.C. litigation.[9]  Jia-Sobota attempted to resolve the D.C. litigation

---

[3] *BDO USA, LLP v. Eric Jia-Sobota et al.*, 2020 C.A. 002600 B (D.C. Super. Ct. May 26, 2020).

[4] Sanctions Trial Tr. at 81:2–82:21 (Jia-Sobota).

[5] *Id.* at 90:10–22 (Jia-Sobota).

[6] *Id.* at 5:24–6:13 (Jia-Sobota).

[7] Argy Dep. Tr. at 60:18–62:15.

[8] Sanctions Trial Tr. at 124:18–125:5 (Jia-Sobota).

[9] *Id.* at 82:22–83:2 (Jia-Sobota).

through direct negotiations with Chris Orella, a BDO partner.[10] Those discussions began in Fall 2020 but broke down in January 2021.[11]

After settlement negotiations failed, BDO became the target of a social media smear campaign attacking BDO and its senior leadership. The campaign involved no fewer than 50 YouTube videos and 40 Tweets accusing BDO partners of racism, bigotry, homophobia, sexual harassment, corruption, and fraud, among other things.[12] The campaign also used fake LinkedIn accounts impersonating BDO executives and email accounts used to disseminate defamatory content directly to BDO clients.[13] Some of the posts appeared to draw on information obtained by Jia-Sobota when he was a BDO partner.[14] The campaign occurred from February 13 through around April 5, 2021.[15]

Jia-Sobota has a narrative about who was behind the smear campaign—an anonymous person who contacted him through a Swismail.com account at the end of January or early February 2021.[16] According to Jia-Sobota, the stranger described himself

---

[10] JX-222 (email exchange between Orella and Jia-Sobota between January 11 and 13, 2021).

[11] Sanctions Trial Tr. at 83:3–85:1 (Jia-Sobota).

[12] *See* JX-38 ("Am. Compl.") ¶¶ 32–172; *see also* JXs-218–220 (smear campaign videos).

[13] *See* Am. Compl. ¶¶ 169–171, 173–181.

[14] *Compare, e.g.*, JX-218 (smear campaign videos using recorded sound clips of supposed BDO partners describing accounting practices during a meeting), *with* Jia-Sobota (May 27, 2021) Dep. Tr. at 84:17–88:17 (Jia-Sobota describing how one of the campaign videos drew upon recordings of a meeting he attended with other BDO personnel).

[15] *See* JX-158 ¶ 10 ("Roffman Rep.")

[16] Sanctions Trial Tr. at 23:14–24 (Jia-Sobota); *see also* Jia-Sobota (May 27, 2021) Dep. Tr. at 15:9–16:14.

3

as part of a larger "movement" to highlight "BDO's racism and sexism for black history month and women's month . . . and if [Jia-Sobota] had any information to share, [he] could do so anonymously."[17] Jia-Sobota created his own Swismail account to communicate with the stranger. Jia-Sobota states that he provided information to this person, including links to the D.C. litigation and contact information for BDO personnel that were "helpful" in his earlier litigation.[18] This decision does not make factual findings as to Jia-Sobota's narrative, except to say that it was proffered by Jia-Sobota during depositions in this action.

### B. BDO Files Suit In The Court Of Chancery.

On March 22, 2021, BDO filed suit in the Delaware Court of Chancery against EverGlade seeking injunctive relief and damages in connection with the smear campaign. Jia-Sobota learned of the litigation the same day.[19] BDO asserted Count I for defamation *per se*, Count II for tortious interference with business relations, Count III for injunctive relief, and Count IV for civil conspiracy.[20] On March 29, 2021, BDO amended its complaint (the "Amended Complaint") to add Count V for deceptive trade practices under Delaware's Deceptive Trade Practices Act and Count VI for trade libel.[21]

With its initial filing, BDO moved for expedited proceedings and a temporary restraining order ("TRO").[22] The court denied the motion for a TRO in a bench ruling on

---

[17] Jia-Sobota (May 27, 2021) Dep. Tr. at 15:25–16:8.

[18] *Id.* at 16:15–17:6.

[19] *Id.* at 83:16–84:6.

[20] Dkt. 1 ¶¶ 149–173.

[21] Am. Compl. ¶¶ 183–218 (citing 6 *Del. C.* §§ 2532, 2533(c)).

[22] *See* Dkt. 7.

4

April 9, 2021, reasoning that the relief sought was quite broad and that it appeared to seek to enjoin categories of speech beyond the reach of equity.[23]  The court, however, granted BDO's motion to expedite proceedings due to the troubling nature of the allegations and the potential harm to BDO.[24]  The court ordered the parties to confer on a schedule for expedited proceedings.

No further action to continue the smear campaign occurred after April 5, 2021.[25]

### C.  EverGlade Suspends Jia-Sobota And Begins An Internal Investigation.

On April 28, 2021, the EverGlade Board decided to conduct an internal investigation into BDO's claims.  It suspended Jia-Sobota from his positions as director and CEO of EverGlade while the investigation was pending.[26]  Counsel for EverGlade informed the court of this development during an April 30, 2021 hearing and represented that Jia-Sobota was "completely restricted from any access to EverGlade's systems or data."[27]  Counsel further represented that Delaware counsel had taken the reins of decision-making regarding EverGlade's defense in the litigation.[28]

---

[23] *See* Dkt. 51 (Apr. 9, 2021 Hr'g Tr.) at 44:19–24.

[24] *See id.* at 44:5–45:16.

[25] *See* Dkt. 210 ("Nov. 4, 2021 Hr'g Tr.") at 37:12–17.

[26] *See* JX-46 (minutes of April 28, 2021 EverGlade board meeting temporarily suspending Jia-Sobota as CEO and from the board); Sanctions Trial Tr. at 37:6–10 (Jia-Sobota).

[27] Dkt. 66 ("Apr. 30, 2021 Hr'g Tr.") at 7:11–19.

[28] *Id.* at 7:20–8:6.

5

## D. The Scope Of The Investigation

On May 3, 2021, EverGlade hired Julian Ackert of iDiscovery Solutions ("iDS") to provide discovery services in connection with this action and to conduct a forensic review in support of the internal investigation.[29] iDS collected and imaged devices beginning on May 7, 2021, starting with the following devices in Jia-Sobota's possession: an iPad; Jia-Sobota's personal and work laptops; Jia-Sobota's iPhone; and a thumb drive.[30] iDS collected these devices from Jia-Sobota at his residence on May 7, 2021.[31]

It is unclear to what degree Jia-Sobota was involved in the internal investigation. Jia-Sobota testified at the Sanctions Trial that he had no knowledge of the investigation and no involvement in directing which devices iDS collected for analysis.[32] Ackert took the same position at the Sanctions Trial—he testified that EverGlade's counsel alone directed the investigation and defined its scope.[33] Contemporaneous emails show, however, that Jia-Sobota identified which electronic devices would be collected and examined in the investigation.[34] And Jia-Sobota admitted that he did not disclose to iDS additional online accounts that he used, including the Gmail and Swismail accounts he

---

[29] *See* JX-48 (iDS Engagement Letter Signed May 3, 2021); Roy Dep. Tr. at 183:22–185:4.

[30] JX-205 (list of devices later collected by BDO's forensic investigator for inspection, some of which were received from iDS).

[31] JX-159 (Ackert Decl.) ¶ 8.

[32] Sanctions Trial Tr. at 117:11–20, 119:3–6 (Jia-Sobota).

[33] *Id.* at 160:22–161:1, 161:22–162:10 (Ackert).

[34] JX-49 (May 5, 2021 email from EverGlade's counsel listing the devices to be collected, which is merely cut and pasted from an email from Jia-Sobota, written in the first person and containing Jia-Sobota's signature block); JX-70 at IDS000176 (same); *see also* Ackert Dep. Tr. at 40:10–17.

supposedly used to communicate with the stranger whom he blames for the smear campaign. As a result, iDS's data collection was limited.

On May 10, 2021, iDS's Tyler Swasy emailed EverGlade's litigation counsel, Marc Casarino, describing an issue with his attempt to image Jia-Sobota's laptop. Swasy said that the disk used to collect the data had been corrupted.[35] On May 11, Swasy contacted Jia-Sobota and told him he needed to reimage Jia-Sobota's work laptop, which also occurred on May 11, 2021.[36]

### E. iDS Reports Preliminary Results Of The Investigation To Outside Counsel.

By early June 2021, iDS discovered that a software called "CCleaner" used to "clean" data from computers had been run on Jia-Sobota's EverGlade work laptop during the smear campaign.[37] There was no internet browsing history on Jia-Sobota's EverGlade work laptop.[38] Data artifacts, however, established that Jia-Sobota actually used both Google Chrome and Microsoft Edge in March and April 2021.[39] iDS concluded that, prior to its collection, all internet browsing history had been wiped from the laptop.[40] iDS also

---

[35] JX-164 ("Swasy Decl.") ¶ 6; *see also id.*, Ex. A at IDS000315.

[36] Swasy Decl. ¶ 6.

[37] *See* JX-87 (email exchange between Swasy and Ackert between May 24 and June 11, 2021, discussing the use of CCleaner on Jia-Sobota's work laptop).

[38] *Id.*

[39] *See* JX-180.

[40] *Id.*

concluded that the laptop had either been factory reset or a new operating system was installed as of April 15, 2021.[41]

In an internal iDS email, Ackert summarized iDS's findings in preparation for a meeting with EverGlade's counsel.[42] The findings stated that CCleaner was used, that there was "zero Chrome browser history" on Jia-Sobota's EverGlade work laptop, and that Jia-Sobota's personal laptop had been reset.[43] iDS briefed EverGlade's litigation counsel on these issues, including the use of CCleaner.[44]

### F.     EverGlade Reinstates Jia-Sobota.

By mid-June 2021, EverGlade's two remaining Board members, Argy and Franz, wanted nothing more to do with EverGlade. After learning about the smear campaign,[45] and concerned that legal fees and Jia-Sobota's mismanagement were draining the company's resources,[46] they decided to exit their investment.

---

[41] Sanctions Trial Tr. at 168:16–24 (Ackert); *see also* JX-87 at IDS000115.

[42] *See* JX-87 at IDS000115.

[43] *Id.*

[44] Sanctions Trial Tr. at 170:3–173:1 (Ackert) (discussing conversations Ackert had with Casarino); *see also* Dkt. 81 ("Klein Appearance"); Sanctions Trial Tr. at 224:8–225:14 (Ackert) (stating that he communicated directly with EverGlade's new counsel by June 18, 2021).

[45] Argy Dep. Tr. at 19:5–24 (After learning about the smear campaign, Franz and Argy "were talking about more about [sic] how to protect ourselves and disassociate ourselves with Eric. Q. And what did you guys talk about . . . how to dissociate yourself [sic]? A. Not become a shareholder anymore.").

[46] *Id.* at 55:14–57:15 (stating that he wanted out because "the company wasn't doing well and most of it was because [Jia-Sobota] was spending a ton of money—of the company's money—on legal fees."); *see also id.* at 56:6–19 (discussing how the company's "monthly shareholder discussions . . . didn't have a lot of information in [them]. So that bothered

On June 12 and June 16, 2021, respectively, Argy and Franz resigned from the EverGlade board.[47] They contemporaneously entered stock repurchase agreements with EverGlade, selling their entire respective interests in the company.[48] To complete their exodus, on June 16, 2021, they reinstated Jia-Sobota as CEO and board member.[49]

By August 2021, Jia-Sobota transferred 51% of his EverGlade stock to his spouse, Jerry Jia-Sobota, for no consideration, while retaining the remaining 49%.[50] Also on August 1, 2021, Jerry "replaced" Jia-Sobota as Chairman of the Board and became President of EverGlade.[51] Jerry Jia-Sobota did not take on any actual responsibility in these roles, however, because he was on medical leave.[52] Jia-Sobota served as interim President and the sole member of an executive committee of the Board that had full power

me."); *id.* at 56:6–57:22 (stating that Jia-Sobota "cooking the books . . . is what concerned me about getting out").

[47] *See* JX-90 (June 12, 2021 resignation letter of Paul Argy); JX-92 at EG000924 (June 16, 2021 resignation letter of Matthew Franz); *see also* Dkt. 305 ("Pl.'s Opening Post-Sanctions Trial Br.") at 15.

[48] JX-90 at 3–5 (June 12, 2021 promissory note between Argy Capital Corporation and EverGlade); JX-92 at EG000912–000916 (stock repurchase agreement dated June 16, 2021 for Matthew Franz).

[49] JX-91 (June 16, 2021 unanimous consent of board reinstating Jia-Sobota); Sanctions Trial Tr. at 48:18–21 (Jia-Sobota) ("Q. [Y]ou were reinstated as CEO and chairman and so forth on June 16th, 2021, is that about right, in terms of dates? A. Yes.").

[50] *See* JX-108. To distinguish Jerry Jia-Sobota from Eric Jia-Sobota, this decision uses Jerry's full name and refers to Eric as "Jia-Sobota."

[51] *Id.* at EG053056.

[52] Sanctions Trial Tr. at 38:12–15 (Jia-Sobota).

to act unilaterally.[53]  Taken collectively, with the exception of his brief period of suspension, Jia-Sobota's responsibilities did not change until October 2021.

### G.    Jia-Sobota Replaces EverGlade's Outside Counsel.

After being briefed by iDS on the use of CCleaner on Jia-Sobota's work laptop, EverGlade's prior legal counsel ceased to act as EverGlade's counsel and, by early July 2021, formally withdrew from representing EverGlade.[54]  EverGlade's new counsel took over on June 16, 2021, and shortly thereafter became Jia-Sobota's personal counsel as well.[55]

On June 18, 2021, iDS's Ackert briefed EverGlade's new outside counsel on the forensic investigation and the use of CCleaner on Jia-Sobota's work laptop.  Ackert explained what CCleaner is, what its effects are, and how frequently it was run during the smear campaign.[56]  On June 21, 2021, both Ackert and EverGlade's new counsel spoke to Jia-Sobota and informed him of the results of the forensic investigation.[57]  Ackert told Jia-Sobota that because of the lack of data on his work laptop—including web browser history—the investigation was "inconclusive," so iDS would not be able to prepare a report

---

[53] JX-108 at EG053075 (August 1, 2021 appointment of Eric Jia-Sobota as proxy for Jerry Jia-Sobota's stock interests).

[54] Sanctions Trial Tr. at 172:11–173:1 (Ackert); Klein Appearance; Sanctions Trial Tr. at 224:8–225:14 (Ackert) (stating that he communicated directly with new EverGlade counsel by June 18, 2021).

[55] Jia-Sobota (Sept. 16, 2021) Dep. Tr. at 7:22–8:9.

[56] Sanctions Trial Tr. at 226:4–227:15 (Ackert).

[57] *Id.* at 227:16–228:5 (Ackert).

"clearing" Jia-Sobota of potential involvement in the smear campaign.[58] Nor could iDS substantiate any aspect of Jia-Sobota's story about having been contacted by an anonymous Swismail user.[59]

Jia-Sobota was frustrated that iDS was unwilling to "clear" EverGlade of involvement in the smear campaign.[60] He began to pressure EverGlade's counsel and iDS to reach a different conclusion. On June 22, 2021, Jia-Sobota emailed iDS, stating his belief that iDS was "looking at this wrong. While I understand that it may be hard to show I did or did not log into swismail [sic] as an example, who cares[?] That is BDO[']s job. Our job is to show [that EverGlade] did not create or post videos."[61] Jia-Sobota outlined a report that he requested iDS prepare, including answers to the following questions:

- During the relevant time period, which Jia-Sobota defined as February 1 through March 27, 2021, "[d]id anyone at EverGlade have NordVPN installed on their controlled devices?"[62]

- During the relevant time period, "did any EverGlade controlled devices have Filmora installed or use Filmora?"[63]

- During the relevant time period "(up to the filing of the lawsuit) was there evidence that these videos were in EverGlade[']s possession?"[64]

---

[58] *Id.* at 53:4–22, 55:2–11 (Jia-Sobota), 227:16–228:5 (Ackert).

[59] *Id.* at 53:1–54:18 (Jia-Sobota).

[60] *Id.* at 55:7–14 (Jia-Sobota).

[61] JX-95 at IDS000099 (email from Jia-Sobota to Ackert dated June 22, 2021).

[62] *Id.*

[63] *Id.*

[64] *Id.*

11

- "Twitter: Is there any evidence that anyone had registered the following accounts on any device controlled by EverGlade? A. #boycottbdo; B. #boycottbdo1; c. #boycottbdo2[.]"[65]

- Whether there was "any evidence on any device controlled by [E]ver[G]lade that they had accessed a VPN network" at certain times related to YouTube, Gmail, and LinkedIn account logins.[66]

Ackert refused to draft such a report.[67]

## H.    EverGlade's Litigation Conduct

During the period of iDS's investigation, EverGlade and Jia-Sobota were doing their best to obstruct discovery in this litigation. They first fought BDO's request to depose Jia-Sobota and required BDO to seek relief from the court.[68] Jia-Sobota ultimately sat for a deposition on May 27, 2021. This was before EverGlade's initial counsel of record withdrew, so Jia-Sobota hired separate, personal counsel to defend his deposition. Jia-Sobota's personal counsel was truculent. He refused to permit counsel for EverGlade to object on behalf of EverGlade. He interposed speaking objections intended to coach the witness and asserted inappropriate objections, such as objections on grounds of "scope" and "dead horse." Counsel then unilaterally terminated the deposition when faced with a

---

[65] *Id.*

[66] *Id.* at IDS000109–11.

[67] Sanctions Trial Tr. at 229:8–23 (Ackert).

[68] *See* Dkt. 49 (letter from EverGlade to the court dated April 30, 2021, describing BDO's request to depose Jia-Sobota as an attempt to "get around the stay in the DC litigation"); *see also* Apr. 30, 2021 Hr'g Tr. at 8:7–23 (counsel for EverGlade stating that EverGlade's interests and Jia-Sobota's are "not entirely consistent[,]" thus explaining why Jia-Sobota had retained separate counsel and causing "some issues with respect to coordinating"). Despite EverGlade's attempts to frame Jia-Sobota's reticence as a matter of course, the court held on April 30, 2021, that Jia-Sobota "needs to make himself available to be deposed . . . . There's not going to be obstructionist behavior here." *Id.* at 12:4–9.

line of questioning that he did not like.[69] This conduct prompted another motion to compel, for which the court scheduled a hearing on June 30, 2021.[70]

During the June 30, 2021 hearing, the court gave the parties guidance on how to proceed, while commenting on the dreadful conduct of Jia-Sobota's counsel during his May deposition. The court urged counsel to hit a proverbial reset button and live up to their obligations as officers of the court.[71]

That did not happen. Discovery proceeded after the June 30, 2021 hearing much like it had before. BDO pressed EverGlade on its discovery shortcomings.[72] EverGlade resisted, claiming that it had fully met its discovery obligations. For example, when BDO requested to inspect EverGlade's devices in July 2021, EverGlade asserted that it had "complied fully" with BDO's discovery requests.[73] EverGlade made these representations

---

[69] *See, e.g.*, Jia-Sobota (May 27, 2021) Dep. Tr. at 130:20–22, 137:23–138:2, 170:21, 171:17–22, 178:4, 183:2–5, 206:2–207:1; *see also id.* at 208:18–25 (counsel for EverGlade stating that it would "follow the advice of [Jia-Sobota's personal counsel] and allow the witness to terminate the deposition at this time").

[70] Dkt. 110 (Judicial Action Form); Dkt. 136 ("June 30, 2021 Hr'g Tr."); Dkt. 67.

[71] June 30, 2021 Hr'g Tr. at 27:2–11 ("I'm hoping what can happen today is you leave here and hit reset in a meaningful way. Because as officers of the Court, your job as discovery facilitators is not just to get the discovery and defend the person delivering it; it's to make sure proceedings run according to our rules and expectations. And I know all of counsel in this courtroom today can do that and have done that ably for most of your careers. This is not an example of what we expect, and it's not your best.").

[72] JX-101; JX-102; JX-135; JX-143 (discovery correspondence from counsel for BDO, McDermott Will & Emery ("MWE"), to EverGlade counsel (Klein) throughout July, August, and September 2021).

[73] JX-103 (Klein July 15, 2021 Letter) at 1–4.

13

even though EverGlade and its counsel had received iDS's report concerning the use of CCleaner.[74]

Between September 14 and September 17, 2021, four more discovery motions were filed—three by BDO and one by EverGlade. And the case schedule slipped. The court held a hearing on the motions on November 4, 2021,[75] resolving two of the four motions from the bench[76] and appointing Molly DiBianca as Special Discovery Master to address the others.[77]

DiBianca swiftly brokered a resolution for the remaining discovery disputes, which was memorialized in a stipulated form of order entered on November 11, 2021.[78] Among other things, the November 11, 2021 order reflected EverGlade's agreement to provide devices previously imaged by iDS to BDO's forensic expert, Charles River Associates ("CRA"), for its independent imaging.[79]

---

[74] JX-101 (MWE July 13, 2021 Letter); JX-103 (Klein July 15, 2021 Letter); JX-87 at IDS000115 (email thread between Ackert and Swasy summarizing when CCleaner was run); JX-111 at IDS000670 (email from Ackert to EverGlade counsel summarizing the use of CCleaner on Jia-Sobota's work laptop); *see also* JX-112 at IDS000092 (August 2, 2021 email from Todd Bromberg at Wiley Rein—additional EverGlade counsel at the time— stating to Ackert, Swasy, Klein, and others that "Julia [Klein] will be best able to drill down on the CCleaner and anything dealing with the collection/production process" and that she would "deal with MWE and Eric on this").

[75] Nov. 4, 2021 Hr'g Tr.; Dkt. 209 (Judicial Action Form).

[76] Nov. 4, 2021 Hr'g Tr. at 36:7–14, 76:17–18.

[77] Dkt. 208 ("Nov. 5, 2021 Order Appointing Special Master").

[78] Dkt. 211 ("Order Resolving Disc. Mots.").

[79] *See id.* ¶¶ 1–2.

## I. Discovery Reveals Massive Spoliation, Prompting The Sanctions Motion.

The device inspection resulting from the November 11, 2021 order revealed to BDO what EverGlade already knew—that much of the discovery BDO sought had been destroyed. Between February and September 2021—the period during and immediately following the smear campaign—Jia-Sobota destroyed an enormous amount of evidence. As BDO expert witness and CRA employee, Daniel Roffman, would later testify at the Sanctions Trial, the devices at issue were either "factory reset or there were significant deletions."[80] Jia-Sobota had also wiped internet browsing data and used CCleaner to destroy files on his work laptop.[81] Roffman wrote a January 18, 2022 report that comprehensively assesses the full scope of the deletion (the "Roffman Report"), which was as an exhibit at the Sanctions Trial.[82]

BDO proved that Jia-Sobota undertook the following spoliative or obstructive acts:

- Jia-Sobota set up CCleaner to automatically remove, from February 16 through March 23, 2021, "past internet history, recently-opened document information, and recycle bin artifacts" from his work computer.[83] The

---

[80] Sanctions Trial Tr. at 306:6–12 (Roffman).

[81] *See id.* at 22:15–22 (Jia-Sobota); *id.* at 307:22–308:15 (Roffman).

[82] *See* Roffman Rep.

[83] *Id.* ¶ 45; *see also* Sanctions Trial Tr. at 309:2–310:19 (Roffman). Jia-Sobota also testified in his deposition to this effect. *See* Jia-Sobota (January 12, 2022) Dep. Tr. at 32:14–18. At the evidentiary hearing, however, Jia-Sobota recanted his statement that he had set up CCleaner to run automatically. *See* Sanctions Trial Tr. at 26:2–28:8 (Jia-Sobota). Nonetheless, Roffman's estimate of the scope of the spoliation is convincing given the pattern of destruction to which Jia-Sobota testified generally.

Roffman Report estimated that this alone would have destroyed over 100,000 files on Jia-Sobota's work laptop.[84]

- Jia-Sobota wiped the internet history from his personal iPhone and iPad prior to May 7, 2021,[85] after which these devices were sent back to Apple without first being imaged.[86]

- Jia-Sobota deleted files and images from an EverGlade OneDrive account, which he used for document and data storage.[87]

- Jia-Sobota destroyed documents on seven thumb drives that iDS had provided to CRA on November 21, 2021.[88] Jia-Sobota was the sole custodian of these thumb drives.[89] He deleted documents from five of them.[90] iDS was able to image the sixth, but neither the sixth nor seventh contained data related to the smear campaign "within the viewable files."[91]

- Jia-Sobota removed—or worked with someone else at EverGlade to remove—*all* user data from seven of the eight laptops that iDS would review and hand over to CRA by conducting "factory resets" of those devices between May 28 and September 15, 2021.[92] Jia-Sobota also conducted factory resets of his personal laptop—which had previously been a former EverGlade employee's work laptop—on April 15, 2021,[93] and August 26,

---

[84] Roffman Rep. ¶ 85 (citing Jia-Sobota (Jan. 12, 2022) Dep. Tr. at 49:17–50:15); *see also* Sanctions Trial Tr. at 241:16–24 (Ackert) (The Court. "[Y]ou stated on cross that you don't know what the volume of cached files was that was deleted; correct? A. I don't. The Court. So it could have been hundreds of thousands? We don't know? You don't know? A. We don't know. But that's not surprising to me if it was a cache.").

[85] Roffman Rep. ¶ 113.

[86] Jia-Sobota (July 21, 2021) Dep. Tr. at 105:17–106:13.

[87] Roffman Rep. ¶¶ 82–83; *see also* Sanctions Trial Tr. at 17:15–18:12 (Jia-Sobota).

[88] Sanctions Trial Tr. at 319:10–14 (Roffman).

[89] Roffman Rep. ¶¶ 103, 112; Sanctions Trial Tr. at 319:10–14 (Roffman).

[90] Roffman Rep. ¶ 112.

[91] *Id.*

[92] *Id.* ¶ 103; Sanctions Trial Tr. at 317:19–318:5 (Roffman).

[93] Roffman Rep. ¶ 96; Sanctions Trial Tr. at 344:2–13 (Roffman).

2021.[94] The factory resets "removed all of the data and overwrote substantial portions of the hard drive."[95]

Although Jia-Sobota was responsible for the lion's share of the spoliation, his spouse also destroyed evidence. Specifically, Jerry Jia-Sobota traded in his iPhone in September 2021 and thus could not produce it for review.[96] He conducted at least three of the above-mentioned factory resets on EverGlade employee computers in or around September 2021,[97] which eliminated any materials or access to tools and/or VPNs that might have been used in the campaign.[98] EverGlade had not undertaken any preservation efforts on these laptops before the factory resets.

Although the deletion was substantial, Roffman was able to use forensic tools to reconstruct traces of activity on Jia-Sobota's laptop and EverGlade's OneDrive account. Plaintiff used this reconstruction to suggest that Jia-Sobota and EverGlade were involved in the smear campaign.[99] This decision does not make any factual findings concerning whether Jia-Sobota and EverGlade perpetuated the campaign.

---

[94] Roffman Rep. ¶ 103 (chart outlining factory resets); *see also* Sanctions Trial Tr. at 344:2–13 (Roffman).

[95] Sanctions Trial Tr. at 319:2–9 (Roffman).

[96] Jia-Sobota (July 21, 2021) Dep. Tr. at 106:5–13.

[97] JX-161 (Kessler Aff.) ¶ 4; JX-162 (Paterson Aff.) ¶ 4; JX-163 (Son Aff.) ¶ 4.

[98] Roffman Rep. ¶ 103; *see also id.* ¶¶ 104–106; Sanctions Trial Tr. at 317:9–18 (Roffman) (describing the factory reset process on the computers in question).

[99] For example, a deleted but recovered data artifact on Jia-Sobota's EverGlade work laptop showed that Jia-Sobota opened an image file of Charles Dewhurst, a BDO partner, from a USB device plugged into Jia-Sobota's EverGlade work laptop on March 13, 2021. Sanctions Trial Tr. at 319:10–321:6 (Roffman); Roffman Rep. ¶¶ 76–77. Data artifacts show that on March 13—when the Dewhurst file was accessed—Jia-Sobota was using a

The newly revealed spoliation prompted BDO to move for sanctions, including adverse inferences or default judgment (the "Sanctions Motion").[100] The court scheduled a hearing on the Sanctions Motion for March 16, 2022.[101]

During the March 16, 2022 oral argument on the Sanctions Motion, EverGlade admitted that Jia-Sobota had engaged in spoliation.[102] EverGlade, however, attempted to distance itself from Jia-Sobota, even though he was the company's founder, controlling stockholder, CEO, and board chairman. In response, the court converted trial on Plaintiff's claims to a trial into the Sanctions Trial—a two-day evidentiary hearing on EverGlade's role in connection with the spoliation.[103]

---

snipping tool on his laptop that creates image files. On March 13, someone posted a video to the boycottBDO YouTube account with an image of Charles Dewhurst. Roffman Rep. ¶¶ 76–77. At the Sanctions Trial, Jia-Sobota did not deny opening the Dewhurst image file on March 13, 2021; he offered no explanation for why he did so. Sanctions Trial Tr. at 19:19–20:4 (Jia-Sobota). As another example, on March 10, 2021, at 5:52:21 p.m. ET, Jia-Sobota accessed a file titled "Adeyinka Pierce.docx" from a OneDrive Folder on Jia-Sobota's work laptop. Roffman Rep. ¶ 83; Sanctions Trial Tr. at 324:23–325:18 (Roffman). Pierce's image first appeared in a boycottBDO video four days later on March 14, 2021. JX-219.

[100] Dkt. 227 ("Pl.'s Mot. for Spoliation Sanctions").

[101] Dkt. 235 (Minute Order Scheduling Mar. 16, 2022 Hr'g).

[102] Dkt. 272 ("Mar. 16, 2022 Hr'g Tr.") at 22:11–14 (Counsel for EverGlade saying that "[w]e're not here today to defend what happened on or before March 23, 2021. We're here today to defend EverGlade against BDO's request for case-dispositive sanctions."); *id.* 44:7–9 ("Should it have happened? If I had been counsel then, [Jia-Sobota's laptop] would have been sitting in my office, Your Honor, okay? But I wasn't.").

[103] *See* Dkt. 269; Mar. 16, 2022 Hr'g Tr. at 62:18–63:9; *see also* Sanctions Trial Tr.

**J.     Jia-Sobota Admits To Spoliation But Claims It Was Justified Because He Was Fearful That BDO Would Take Threatening Action If It Obtained The Evidence.**

When forced to reckon with the mounting evidence of his spoliation during the Sanctions Trial, Jia-Sobota first claimed that he did not remember much.[104] He then offered a new narrative, testifying that he destroyed evidence out of fear that BDO would do something to him if BDO acquired evidence of the smear campaign.

Jia-Sobota claimed that he "didn't want to be retaliated [against] by BDO any more than I already had been."[105] He said that he was afraid for his life,[106] that BDO had "sent people to my house for months to harass me[,]" in response to which he "had to go out and get a concealed carry permit."[107] He added that people from BDO would come "at night, pounding on windows" and "shining laser pointers in my window[,]" and that BDO "even sent the Metropolitan Police to my house."[108] He claimed that this fear of retaliation also motivated him to lie in his prior deposition testimony about his document preservation efforts.[109]

---

[104] *Id.* at 31:16–32:1 (Jia-Sobota) ("Q.   So was your intentional spoliation campaign broader than just web-browser history?  A. I don't know.  Q.  Well, you're the one that did it, sir.  This is your opportunity to tell the Court what you intended and what the scope of your intentional conduct was.  Is your answer 'I don't know what I did'?  A. Yes.").

[105] *Id.* at 24:1–6 (Jia-Sobota).

[106] *Id.* at 24:7–16 (Jia-Sobota).

[107] *Id.* at 24:7–25:6 (Jia-Sobota).

[108] *Id.* at 116:1–13 (Jia-Sobota).

[109] *Id.* at 26:2–28:8 (Jia-Sobota).

19

EverGlade leaned into this theme in its Post-Sanctions Trial briefing, citing Jia-Sobota's testimony[110] and an email from Jia-Sobota to Ackert and Klein on September 5, 2021 referencing "paid goons outside my house."[111]

The narrative is no justification for spoliation. It was not credible in any event.

## K. The Court Of Chancery Action Is Transferred To The Superior Court.

Before the Sanctions Trial, and in a last-ditch effort to evade this court's gaze, EverGlade filed a motion to dismiss for lack of subject matter jurisdiction in the Court of Chancery on March 11, 2022.[112] Specifically, EverGlade appealed to the no-injunction rule, which circumscribes the Court of Chancery's equitable jurisdiction when invoked to enjoin future, defamatory statements.[113] In essence, EverGlade argued that because the conduct at issue in BDO's claims is speech, a jury should be available to decide the central issues, such as malice and damages for the defamation claim.[114]

Upon review, I determined that Court of Chancery jurisdiction would be proper over the majority of BDO's claims, but was "concern[ed] about overextending equitable authority when it pertains to speech."[115] Nonetheless, transferring the case either in its entirety or in part to a separate jurist would have resulted in judicial inefficiency, given the

---

[110] *See* Dkt. 307 ("Def.'s Opening Post-Sanctions Trial Br.") at 11–12 (citing Sanctions Trial Tr. at 24:12–25:16, 116:1–24 (Jia-Sobota)).

[111] Def.'s Opening Post-Sanctions Trial Br. at 12 n.29 (citing JX-151 at IDS000019).

[112] Dkt. 261.

[113] *See* Dkt. 314 (November 29, 2022 Letter from Chancellor McCormick to Chief Justice Seitz) at 2, 11 [hereinafter, "Designation Letter"].

[114] Dkt. 261 at 7, 9, 11–12.

[115] Designation Letter at 12.

resources invested into this case to date.[116] Furthermore, it might have rewarded EverGlade for attempting to wriggle out of accountability for its sanctionable conduct.[117] As a result, I requested that the Chief Justice designate me to sit as a Judge of the Superior Court pursuant to his powers under Article IV § 13(2) of the Delaware Constitution.[118] The Chief Justice granted the request in an order dated December 1, 2022,[119] and the case was transferred from its original Court of Chancery docket to that of the Superior Court on BDO's motion.[120]

Shortly after transfer, counsel for EverGlade filed a jury demand.[121] The court's entry of a default judgment, however, forecloses a jury trial.

## II.   LEGAL ANALYSIS

"A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit."[122] To determine whether a person should reasonably anticipate litigation, the court assesses "whether the facts and circumstances . . . lead to a conclusion that litigation is imminent or

---

[116] *Id.* at 12–13.

[117] *Id.*

[118] *See id.* at 1.

[119] Dkt. 315.

[120] Dkts. 317–318; *see also* C.A. No. N22C-12-063 KSM CCLD, Dkt. 1 (Compl.).

[121] *See* C.A. No. N22C-12-063 KSM CCLD, Dkt. 6.

[122] *Beard Rsch., Inc. v. Kates*, 981 A.2d 1175, 1185 (Del. Ch. 2009).

should otherwise be expected. A court may sanction a party who breaches this duty by destroying relevant evidence or by failing to prevent the destruction of such evidence."[123]

EverGlade does not dispute that Jia-Sobota engaged in spoliation by destroying evidence when he had a duty to preserve it. Nor could they. Jia-Sobota and Jerry Jia-Sobota destroyed evidence from February 16 to September 15, 2021. The D.C. litigation was ongoing during that period, and the Delaware litigation commenced in the middle of that period on March 22, 2021.[124] Jia-Sobota received notice of this litigation on March 22, when he received a call from Bloomberg News seeking a comment on the social media campaign and litigation filed that day.[125] Therefore, the destructive acts on or after March 22 were spoliative. Even before March 22, a reasonable person in either Jia-Sobota's or EverGlade's shoes would have understood that they had a duty to preserve the evidence on Jia-Sobota's laptop. The D.C. litigation was ongoing. That case addressed hostilities between BDO and EverGlade over EverGlade's business model, Jia-Sobota's non-compete agreement, and Jia-Sobota's efforts to poach business from BDO. The existence of that litigation in February—paired with the participation in a smear campaign against BDO—gave ample notice to Jia-Sobota that he was under a duty to preserve documents. The result is that every instance in which Jia-Sobota destroyed documents is indeed spoliative.

Rather than dispute that Jia-Sobota engaged in spoliation, EverGlade advances two main lines of defense. First, it argues that Jia-Sobota's spoliation should not be attributed

---

[123] *Id.*

[124] *See* Dkt. 1.

[125] Jia-Sobota (May 27, 2021) Dep. Tr. at 83:16–84:4.

22

to EverGlade.[126]  Second, EverGlade takes aim at what it perceives as excessive sanctions requested by BDO, namely, a potential default judgment.[127]  This analysis first concludes that Jia-Sobota's acts of spoliation were done on behalf of EverGlade and then addresses the appropriate sanctions.

### A.  Jia-Sobota Spoliated Documents On Behalf Of EverGlade.

BDO advances two theories of why Jia-Sobota's acts can be attributed to EverGlade. BDO first raises an agency theory, arguing that the spoliation can be imputed to EverGlade by virtue of Jia-Sobota's various positions at the company.[128]  BDO next raises a *respondeat superior* theory, detailing how the spoliation occurred within the scope of Jia-Sobota's employment at EverGlade, took place on EverGlade's technology, and had the express purpose of aiding EverGlade in this litigation.[129]  EverGlade urges the court to apply the *respondeat superior* framework,[130] arguing that EverGlade is not vicariously liable for Jia-Sobota's spoliation because his role as CEO did not include administering social media campaigns and because he had a purely personal motive for destroying evidence.[131]  Even applying EverGlade's chosen legal framework, however, EverGlade is liable for Jia-Sobota's actions.

---

[126] *See* Def.'s Opening Post-Sanctions Trial Br. at 24–29.

[127] *Id.* at 29–31.

[128] Pl.'s Opening Post-Sanctions Trial Br. at 46 ("There is no reason to depart from the general rule that corporations are liable for the acts of their agents.").

[129] *Id.* at 47–48.

[130] *See* Def.'s Opening Post-Sanctions Trial Br. at 1–2, 24–25.

[131] *Id.* at 25–27.

Under the doctrine of *respondeat superior*, "[a] servant is authorized to do anything which is reasonably regarded as incidental to the work specifically directed or which is usually done in connection with such work."[132]  The scope of employment includes "acts of the servant so closely connected with what he is employed to do, so fairly incidental to it, that they are to be regarded as methods elected by the servant, even though improper, of carrying out the master's business."[133]  Whether or not *respondeat superior* imputes an agent's actions to a principal "can be answered only in light of the particular circumstances of the case under consideration."[134]

Delaware follows the Restatement (Second) of Agency's "scope of employment" test to determine whether the circumstances warrant imputing an agent's actions to its principle.  Under the Restatement, an employee's act that does not involve the use of force is within the scope of his employment when: "(1) it is of the kind he is employed to perform; (2) it occurs within the authorized time and space limits; [and] (3) it is activated, in part at least, by a purpose to serve the master[.]"[135]

---

[132] Restatement (Second) of Agency, § 229 cmt. a (Am. L. Inst. 1958).

[133] *Draper v. Olivere Paving & Constr. Co.*, 181 A.3d 565, 569 (Del. 1962).

[134] *Id.*; *see also* Restatement (Second) of Agency, § 229 cmt. a ("The limits of the scope of employment are dependent upon the facts of the particular case.").

[135] *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1201 (Del. 2015) (quoting *Doe v. State*, 76 A.3d 774, 776 (Del. 2013) (quoting Restatement (Second) of Agency § 228)); *see also Draper*, 181 A.3d at 569 (adopting the Restatement (Second) of Agency's *respondeat superior* framework as the operative test in Delaware).  If the act involves force, then the analysis involves a fourth inquiry—whether "the use of force is not unexpectable by the master." *Id.*

Here, the act relevant to the court's analysis is management (or mismanagement) of evidence. EverGlade argues that the relevant "act" involved Jia-Sobota's management of EverGlade's social media presence.[136] Where, however, the question is whether to attribute acts of spoliation to an employer under facts like these, the analysis more logically centers on the employee's obligation with respect to the litigation, including the obligation to manage and preserve evidence. Imagine an officer of a corporate defendant destroys relevant evidence in the face of a litigation hold, for instance. To assess the corporation's responsibility, it is not important to know what specific task the officer was doing before he took a break to shred documents or delete emails. What matters in that scenario is his clear obligation to preserve documents related to the litigation.

BDO has satisfied the three relevant elements of the scope-of-employment test. The first element is met. As CEO, Jia-Sobota was responsible for managing all of EverGlade's operations. This included overseeing litigation on behalf of EverGlade,[137] and the record reflects that Jia-Sobota did this by leading settlement negotiations with BDO regarding the D.C. suit.[138] The record also reflects that Jia-Sobota managed EverGlade technology—he reset and stored former employees' computers after they either left or obtained new computers. Preserving evidence, including electronic data on company computers, therefore, was the kind of act he was employed to perform.

---

[136] Def.'s Opening Post-Sanctions Trial Br. at 25–27.

[137] Pl.'s Opening Post-Sanctions Trial Br. at 48.

[138] *See, e.g.*, JXs-21–24, JXs-27–29, JX-31.

The second element is also met. Jia-Sobota's spoliation of evidence occurred within authorized space and time limits. Jia-Sobota was working remotely at home during the Covid-19 pandemic under title of CEO. Although Jia-Sobota did not destroy evidence when sitting in an EverGlade office, that does not matter. The entire company was working remotely at the time.[139] And Jia-Sobota also used EverGlade technology to commit his spoliation by destroying evidence on company laptops. Under the circumstances, the second element is met.

The third element, which asks whether Jia-Sobota sought to serve EverGlade, is also met. This court has held that this element is "broadly-worded" and requires only that the conduct at issue is "activated, *in part at least*, by a purpose to serve the master."[140] The employee "need not be motivated solely by a desire to aid her employer: [t]he mere fact that the primary motive of the [employee] is to benefit himself or a third person does not cause the act to be outside the scope of employment."[141]

EverGlade argues that Jia-Sobota's motive for spoliation was personal rather than professional because he sought to protect himself from "retaliation against him following his raising the alarm on BDO's knowing federal rule-breaking and fear at his actions being

---

[139] *See* Pl.'s Opening Post-Sanctions Trial Br. at 48 ("The second factor is ill-fitting for a company that operated remotely.").

[140] *Hecksher*, 115 A.3d at 1202 (emphasis added).

[141] *Id.* at 1202–1203 (internal quotation marks omitted).

26

discovered."[142]  The court has already addressed Jia-Sobota's unsubstantiated and late-developed retaliation theory.

As a factual matter, the only plausible explanation is that Jia-Sobota destroyed the evidence to shield EverGlade and himself from having their roles in the campaign uncovered.  The spoliation occurred in February through September 2021, while EverGlade was immersed in litigation in both D.C. and Delaware.  Roughly contemporaneously, Jia-Sobota had fruitlessly attempted to settle the D.C. suit on behalf of EverGlade, a process that largely concluded in January but briefly picked back up in April 2021.[143]  Litigation costs relating to BDO had been a perennial issue since EverGlade's inception; in Jia-Sobota's words, "[EverGlade has] been sued since the first month we've existed"[144] and the D.C. litigation was "a lot to deal with" and "expensive."[145]  The Sanctions Trial record therefore reflects ample motive for Jia-Sobota to attempt to thwart BDO's claims against EverGlade relating to the smear campaign by destroying evidence.

Furthermore, Jia-Sobota would later directly insert himself into iDS's review process, asserting that "*[o]ur* job" is to show "*we* did not create or post videos"[146]— suggesting that, in his mind, the concealment of EverGlade's connection to the campaign

---

[142] Def.'s Opening Post-Sanctions Trial Br. at 28.

[143] *See* JX-31 (email thread between Jia-Sobota and BDO discussing potential settlement in January 2021); JX-43 (email thread between Jia-Sobota and BDO discussing conditions for settlement in April 2021).

[144] Sanctions Trial Tr. at 90:10–17 (Jia-Sobota).

[145] *Id.* at 81:2–13 (Jia-Sobota).

[146] JX-95 at IDS000099 (email from Jia-Sobota to Ackert dated June 22, 2021) (emphasis added).

was a collective rather than personal effort. Based on the factual record, the only explanation for Jia-Sobota's actions is that he sought to benefit EverGlade.

Even if Jia-Sobota's story of harassment from BDO "goons" were to be believed,[147] it would still be appropriate to impute his spoliation to EverGlade. Mixed-motive conduct satisfies the Second Restatement's third prong for *respondeat superior*; as stated above, "[t]he mere fact that the primary motive of the [employee] is to benefit himself or a third person does not cause the act to be outside the scope of employment."[148] So, even in that alternate reality, Jia-Sobota sought to protect both himself *and* EverGlade from harassment. The presence of goons outside Jia-Sobota's front door might certainly provide a primary, personal motive to spoliate evidence, but that explanation still does not negate the court's other findings. Goons or no, Jia-Sobota destroyed evidence while the D.C. and Delaware cases raged on, and Jia-Sobota's actions sought to improve EverGlade's position in those lawsuits.

In sum, all relevant *respondeat superior* factors are met. Jia-Sobota spoliated evidence within the scope of his employment at EverGlade. This outcome finds further support in the basic policy consideration that corporations might otherwise escape accountability for egregious actions were they off the hook when their CEOs destroy

---

[147] *See* JX-151 at IDS000019 (email from Jia-Sobota referencing "paid goons outside my house").

[148] *Hecksher*, 115 A.3d at 1202–1203 (internal quotation marks omitted); *see also Wilson v. Joma, Inc.*, 57 A.2d 187, 189 (Del. 1988) ("[C]onduct of an employee, although done in part to serve the purposes of the servant or a third person, may be within the scope of employment if the employer's business actuates the employee to any appreciable extent.").

evidence to frustrate an opposing party's case. EverGlade is therefore responsible for Jia-Sobota's spoliation.

## B. Default Judgment Is Appropriate.

Having established EverGlade's responsibility for the spoliation, the next issue is how to address it. BDO seeks entry of a default judgment against EverGlade and fee-shifting.[149] This section addresses BDO's request for a default judgment.

Discovery abuse "has no place in [Delaware] courts, and the protection of litigants, the public, and the bar demands nothing less than that [Delaware] trial courts be diligent in promptly and effectively taking corrective action[.]"[150] "The court has the power to issue sanctions for discovery abuses under its inherent equitable powers, as well as the Court's 'inherent power to manage its own affairs.'"[151] The sanctions imposed must be "just and

---

[149] Mot. for Spoliation Sanctions at 1–2. In its pre- and post-Sanctions Trial briefing, BDO also requests joint and several sanctions against Jia-Sobota himself, even though he is not a party to this litigation. *See* Dkt. 279 (Pl.'s Opening Pre-Sanctions Trial Br.) at 25–29; Pl.'s Opening Post-Sanctions Trial Br. at 50–54. Given the irregularity of the circumstances and Jia-Sobota's clearly deceptive, obstreperous conduct, this request is understandable. Nonetheless, the court is satisfied that a default judgment paired with fee-shifting is sufficient to address the situation.

[150] *In re ExamWorks Gp., Inc. S'holder Appraisal Litig.*, 2018 WL 1008439, at \*6 (Del. Ch. Feb. 21, 2018) (Laster, V.C.) (alterations in original) (internal quotation marks omitted).

[151] *Beard Rsch., Inc.*, 981 A.2d at 1189 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–107 (2d Cir. 2002)).

reasonable."[152]   Generally, sanctions serve one or more of three functions: remedial, punitive, and deterrent.[153]

Where a motion for default judgment arises from spoliation of electronically stored information ("ESI"), Superior Court Rule of Civil Procedure 37(b) governs the analysis. As a predicate to a sanction of default judgment, Rule 37(b) requires that the court make a finding concerning the offending party's state of mind. Specifically, the court must find that the offending party "acted recklessly or with the intent to deprive another party of the information's use in the litigation."[154]   Such a finding is a necessary predicate to lesser sanctions, including a jury instruction that the spoliation of information is unfavorable to EverGlade.

---

[152] *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *9 (Del. Ch. Dec. 4, 2018) (internal quotation marks omitted).

[153] *Beard Rsch., Inc.*, 981 A.2d at 1189; *see also Micron Tech., Inc. v. Rambus Inc.*, 255 F.R.D. 135, 148 (D. Del. 2009) ("Sanctions serve three functions: a remedial function (by restoring the aggrieved party to its original position), a punitive function, and a deterrent function."); *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335 (D. N.J. 2004) ("Spoliation sanctions serve a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without spoliation. They also serve a punitive function, by punishing the spoliator for its actions, and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be."). Sanctions can also serve a coercive function. *See ExamWorks*, 2018 WL 1008439, at *6 ("Sanctions may serve one or more of three proper purposes: 'punishment, deterrence[,] or coercion.'") (alteration in original) (quoting *In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990)).

[154] Super. Ct. Civ. R. 37(b)(2)(F); *see also* Ct. Ch. R. 37(e)(2) (same).

Because default judgment is "the ultimate sanction for discovery violations and should be used sparingly,"[155] a court may enter a default judgment when "no other sanction would be more appropriate under the circumstances."[156] If a lesser sanction would achieve the same ends, default judgment is inappropriate.[157] Lesser sanctions under Rule 37(b) include a presumption "that the lost information was unfavorable to the party" or an instruction that "the jury that it may or must presume the information was unfavorable to the party[.]"[158]

BDO demonstrated at the Sanctions Trial that EverGlade—through Jia-Sobota—acted with the intent to deprive BDO of the use of the information in this litigation. Jia-Sobota admitted this much. He says that he destroyed the evidence intentionally. He claimed that he did so out of fear of BDO's "goons." As discussed above, that testimony was not credible.

But even indulging that testimony, the spoliation was still intentional. "Intentional destruction means the spoliator acted with purpose."[159] Delaware courts have found a

---

[155] *Lehman Capital v. Lofland*, 906 A.2d 122, 131 (Del. 2006); *see also Terramar*, 2018 WL 6331622, at *11 n.59 (collecting cases).

[156] *Beard Rsch., Inc.*, 981 A.2d at 1190 (quoting *Hoag v. Amex Assurance Co.*, 953 A.2d 713, 717 (Del. 2008)).

[157] *See Sundor Elec., Inc. v. E. J. T. Constr. Co.*, 337 A.2d 651, 652 (Del. 1975) ("It has been frequently held that a motion for [a default judgment] will be granted if no other sanction would be more appropriate under the circumstances.") (internal quotation marks omitted); *Hoag*, 953 A.2d at 717 ("The sanction of dismissal is severe and courts are and have been reluctant to apply it except as a last resort.").

[158] Super. Ct. Civ. R. 37(b)(2)(F)(2)(A)–(B).

[159] *State ex rel. Jennings v. Concrete Tech. Resurfacing & Design, Inc.*, 2022 WL 6609883, at *7 (Del. Super. Ct. Oct. 10, 2022) (internal quotation marks omitted).

party's destruction of evidence to be intentional where the party "believed that their conduct would limit the information base [the opposing party] would have to use in the pending litigation."[160] In an alternative, goon-populated reality, Jia-Sobota still acted with purpose. He still sought to limit the information base to which BDO would have access. He did not testify that the goons drove him to a less-than-sound mind. Nor have EverGlade or he argued duress as a basis for excusing their conduct. Jia-Sobota's alternative version of events still results in a finding of intent.

The next issue is whether sanctions less extreme than default judgment would fully achieve the purpose of sanctions. The primary impact of EverGlade's spoliation is that there is no direct evidence concerning EverGlade's involvement (or lack thereof) in the smear campaign. To prevail on any of its claims against EverGlade, BDO would need to prove that EverGlade perpetrated the campaign. To prove this point, BDO should not have to rely on circumstantial evidence, which is all that is left. A default judgment would be an appropriate remedy for this act.

EverGlade urges the court to consider the lesser sanction of adverse inferences.[161] After all, BDO's primary claims are for defamation *per se*,[162] tortious interference with

---

[160] *TR Invs., LLC v. Genger*, 2009 WL 4696062, at *17 (Del. Ch. Dec. 9, 2009).

[161] *See, e.g.*, Def.'s Opening Post-Sanctions Trial Br. at 29 n.82.

[162] BDO characterizes its first cause of action as a claim of "defamation *per se*," but it might be more appropriate to characterize BDO's defamation *per se* claim as a claim for libel. Defamation *per se* in Delaware refers specifically to a type of slander, i.e., oral defamation, but the communications in the smear campaign were electronically written rather than oral. *See Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978) ("libel is written defamation and slander is oral defamation"). Under these facts, however, the distinction

32

business relations, and deceptive trade practices.[163]  To prevail on its primary claims, BDO

would have the burden of proving multiple elements by a preponderance of the evidence.[164]

---

between libel and slander *per se* is a distinction without a difference.  In Delaware, when pleading a claim for libel, "any publication which is libelous on its face is actionable without pleading or proof of special damages.  This is a basic way in which libel differs from slander."  *Id.*; *see also Laser Tone Bus. Sys., LLC v. Delaware Micro-Computer LLC*, 2019 WL 6726305, at *13 (Del. Ch. Nov. 27, 2019) ("Under [Delaware] law, any libel (that is, written publication which defames plaintiff) is actionable without special damages . . . . For slander, the general rule is that oral defamation is not actionable without special damages.") (alteration in original) (internal quotation marks omitted).  But, as stated earlier, slander *per se* does not require a showing of special damages, unlike traditional slander.  The result is that regardless of whether the smear campaign is defamatory *per se* or libelous, BDO would not be required to show special damages.

[163] *See* C.A. No. N22C-12-063 KSM CCLD, Dkt. 1 (Compl.) ¶¶ 183–218.  BDO also asserts claims for trade libel, civil conspiracy, and injunctive relief, but they rise and fall with BDO's primary claims.

[164] The elements of a claim of defamation *per se* are: "(1) a defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury."  *Orthopaedic Assocs. of S. Delaware, P.A. v. Pfaff*, 2018 WL 822020, at *5 (Del. Super. Ct. Feb. 9, 2018); *see also Preston Hollow Cap. LLC v. Nuveen LLC*, 2022 WL 2276599, at *3 (Del. Super. Ct. June 14, 2022) ("In order to succeed on a claim for defamation, a plaintiff must show that: (1) the defendant made a defamatory statement; (2) concerning the plaintiff; (3) the statement was published; and (4) a third party would understand the character of the communication as defamatory.") (internal quotation marks omitted). Note that certain categories of speech that are defamatory *per se* do not require the plaintiff to make any "proof of special damages[.]"  *Pfaff*, 2018 WL 822020, at *5.  Delaware recognizes four categories of speech for defamation *per se* in the slander context, which include "maligning a person in his or her trade or business[.]" *Id.*  The elements of a claim for tortious interference are: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages."  *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) (internal quotation marks omitted).  The elements of a claim for deceptive trade practices under 6 *Del. C.* § 2532 are: "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, that person . . . [d]isparages the goods, services, or business of another by false or misleading representation of fact[.]"  6 *Del. C.* §§ 2532(a), 2532(a)(8).  "Under Delaware law there is no liability for defamation when a statement is determined to be substantially true."  *Holmes v. The News J. Co.*, 2015 WL 1893150, at *3 (Del. Super.

33

For example, BDO would have to demonstrate that the contents of the smear campaign were defamatory. Arguably, EverGlade's spoliation does not impede BDO's ability to obtain or present evidence on the other elements of its claims. Granting judgment in BDO's favor as to those elements, therefore, would not serve to remedy the prejudice to BDO resulting from EverGlade's spoliation. For this reason, EverGlade contends that a lesser sanction is more appropriate.

If courts entered sanctions solely for the purpose of remedying prejudice to a movant, then perhaps a lesser sanction would suffice. But sanctions serve more than remedial purposes—they also punish and deter. EverGlade's acts of spoliation are among the worst one could imagine. If punishment is appropriate anywhere, it is here. If there is any conduct this court needs to deter in future litigation, it is the spoliation committed here. Given the scope of EverGlade's spoliation, neither adverse inferences nor other lesser sanctions would suffice.

In search of a different outcome, EverGlade observes that the court has not entered prior contempt orders or sanctions against it. Although such actions commonly precede the entry of default judgment, they are not required. Where the acts of spoliation are as

---

Ct. Apr. 20, 2015) (internal quotation marks omitted); *see also Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *21 (Del. Ch. Oct. 23, 2002) ("Once a prima facie case [of defamation] has been established by the plaintiff, the defendant may plead the truth of the alleged defamatory statements as a defense."). EverGlade, however, waived its defense of truth by failing to preserve it adequately over the course of this litigation.

34

willful and wide-sweeping as this, prior orders of contempt or sanctions—although common—are not necessary.[165]

## C. BDO Is Entitled To Reasonable Attorneys' Fees And Costs.

The entry of default judgment is a tough act to follow. Although fee-shifting seems rather quotidian by comparison, it is warranted.

"Delaware courts follow the American Rule that each party is expected to pay its own attorneys' fees regardless of the outcome of the litigation."[166] Delaware courts have the ability to shift fees "when faced with vexatious litigation conduct 'to deter abusive litigation and to protect the integrity of the judicial process.'"[167] When ordering fee-shifting in conjunction with other sanctions, "the Court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the Court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."[168]

Here, EverGlade's litigation conduct crossed the line into bad faith. The spoliation is the obvious example of this conduct, which—given its massive scale and prejudice—is sufficient to justify fee-shifting. But the over-aggressive litigation tactics of EverGlade's counsel play a supporting role.

---

[165] *See, e.g.*, *Organik Kimya, San. v. Tic. A.S.*, 848 F.3d 994 (Fed. Cir. 2017) (affirming an administrative agency's entry of a default judgment as a sanction for substantial, bad faith spoliation of evidence without a prior contempt order or sanction).

[166] *Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at *1 (Del. Ch. July 22, 2021).

[167] *Id.* at *1 (quoting *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005)).

[168] Super. Ct. Civ. R. 37(b)(2).

On July 13, 2021, BDO sent a letter outlining deficiencies in EverGlade's production, seeking—among other things—EverGlade's agreement to allow a third-party forensic vendor to conduct a forensic collection of EverGlade's and Jia-Sobota's devices.[169] Counsel for EverGlade responded by a letter dated July 15, denying the "outrageous insinuations" that Jia-Sobota had spoliated evidence.[170] They were not outrageous. Counsel said that BDO's "[d]esperation is [o]bvious" and that Jia-Sobota lost the piece of paper with the Swismail account password because it was a "piece of scrap paper, not a scene from Mission Impossible."[171] There was no desperation. Counsel in the same letter called BDO's request for a third-party forensic vendor review a "thinly veiled attempt by BDO to obtain privileged documents and communications as well as information about the very real investigations into BDO that are presently are [sic] ongoing."[172] Actually, BDO was simply attempting to engage in discovery.

Counsel for BDO later re-raised its initial concerns with EverGlade's document production in a letter to EverGlade's counsel dated September 2, 2021.[173] Based on Jia-Sobota's July 21, 2021 deposition, the letter expressed apprehension regarding iDS's internal review, the effectiveness of Jia-Sobota's suspension from EverGlade, and Jia-Sobota's subsequent reinstatement.[174] Counsel for EverGlade responded on September 13,

---

[169] JX-101.

[170] JX-103 at 3.

[171] *Id.*

[172] *Id.* at 1.

[173] JX-143.

[174] *Id.* at 1–3.

2021, voicing "serious concerns regarding BDO's discovery practices."[175] Counsel for EverGlade said that BDO's September 2, 2021 letter "hyperbolically fabricates certain alleged discovery inconsistencies by selectively quoting from Mr. Jia-Sobota's deposition testimony to prop up its repeated baseless claim that it has concerns about the adequacy of EverGlade's discovery efforts."[176] There was no hyperbole. The claim was not baseless. EverGlade's discovery efforts were inadequate.

It goes without saying that, during contentious litigation, attorneys sometimes take positions in the heat of the moment that they later reevaluate and walk back. Here, however, counsel for EverGlade denied any possibility of spoliation and even mocked BDO for its attempt to probe further, even after learning about the use of CCleaner. Under other circumstances, counsel's conduct might read as a set of attempts to introduce levity, correct misunderstandings, or zealously serve a client believed to be accused improperly of wrongdoing. But here, that approach reflected an error of judgment. Counsel for EverGlade stuck to an aggressive position that forced BDO to trudge through repeated motions just to get to the truth of the matter—that EverGlade had engaged in spoliation of case-terminating magnitude. Such an aggressive litigation strategy was an inappropriate response to the situation, and it contributes to a finding of bad faith. BDO's request for fee-shifting is granted.

---

[175] JX-157 (September 13, 2021 letter from Julia Klein to Ethan Townsend) at 1–3.

[176] *Id.* at 6 (internal quotation marks omitted).

BDO is entitled to recover the reasonable attorneys' fees and expenses that it seeks, which are fees and costs incurred in connection with: bringing the Sanctions Motion; bringing the motion to compel inspection on September 17, 2021; all proceedings before the Special Discovery Master; and all actions taken by BDO, its counsel, and forensic experts pursuant to the court's November 19, 2021 order resolving various discovery motions, including its submission of a discovery protocol consistent with that order.[177]

## III. CONCLUSION

For the above reasons, BDO's motions for entry of default judgment and its motion for fees and expenses are granted. Within ten business days of the entry of this decision, BDO shall submit a petition, supported by an attorney affidavit, detailing the amount of fees and expenses incurred. EverGlade will have five days thereafter to file any objections to BDO's petition. Also within ten business days of the entry of this decision, the parties shall report by letter to the court whether there are any unresolved issues in this action aside from the quantum of fees and expenses. For example, the form of order previously submitted by BDO in the Chancery action does not enter damages in BDO's favor.[178] If BDO is seeking damages, then an additional evidentiary hearing might be warranted. BDO shall clarify the scope of relief it is requesting.

---

[177] Dkt. 227 (citing Pl.'s Mot. for Spoliation Sanctions, Nov. 5, 2021 Order Appointing Special Master, Order Resolving Disc. Mots., Dkts. 166, 212).

[178] Dkt. 227.